The **WALLPAPER MANUFACTURERS, LIMITED, Appellant,**

v.

**CROWN WALLCOVERING CORPORATION, Appellee.**

**Appeal No. 81–550.**

United States Court of Customs and Patent Appeals.

June 17, 1982.

Rehearing Denied July 29, 1982.

Edward M. Prince, Washington, D. C., for appellant.

Albert Robin, New York City, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

NIES, Judge.

This appeal is from the decision of the Trademark Trial and Appeal Board (board)[1] granting a petition to cancel Reg.No. 620,396[2] for the trademark CROWN for wallpaper on the ground of abandonment. We reverse.

## Background

On July 23, 1975, appellee, Crown Wallcovering Corporation (CWC), a New York corporation, filed a petition to cancel the registration of CROWN for wallpaper owned by appellant, The Wall Paper Manufacturers Limited (WPML), a corporation of the United Kingdom.

In the petition, as amended,[3] CWC alleged that for many years it has been using the corporate name Crown Wallcovering Corp., its trade name CROWN WALLCOVERING, and its trademark CROWN in connection with the manufacture, sale and distribution of wallcoverings, including wallpapers; and that CROWN has become and now is the means by which CWC's wallcoverings are known and their source or origin

---

1. The decision of the board is reported at 208 USPQ 686. The board opinion sets out at length the facts, which are somewhat abbreviated here.

2. The registration issued on January 31, 1956, and was timely renewed in 1976. A combined affidavit under sections 8 and 15 (15 U.S.C. §§ 1058 and 1065) of the Trademark Act of 1946 (the Lanham Act) was filed by registrant on July 17, 1961.

3. The original petition was amended after respondent's motion to dismiss the petition for failure to state a claim was in part granted. In addition to the allegations specifically set forth here, the board construed the petition to include implicitly an allegation of likelihood of confusion if CWC and WPML concurrently used CROWN on identical goods. Without such pleading petitioner here would not have had standing. *Lipton Ind. Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (Cust. & Pat.App.1982).

identified. As grounds for cancellation, CWC alleged (1) that prior to CWC's first use of CROWN, or subsequently, WPML had discontinued use of CROWN as a trademark for wallpaper with intent not to resume use of the mark; and, (2) that for the purpose of obtaining a right of incontestability under 15 U.S.C. § 1065, WPML had filed an affidavit on July 17, 1961, falsely asserting continuous use of its trademark CROWN during the preceding five years.

Extensive evidence was submitted by both parties in the form of depositions and accompanying exhibits of advertising, wallpaper books, packaging, and sales figures, to show the manner and extent of their respective uses of CROWN in connection with wallcoverings.

The record shows that WPML is one of the largest wallpaper manufacturers in the world and CROWN is one of its principal trademarks. The testimony of Eric Baverstock, secretary of WPML, was that CROWN has been used throughout the world since 1930, excluding the war years. A summary of its business in the United States under the mark from 1957 to March 1975 showed sales in each year, ranging from a low of £ 4,816 in 1968 to a high of £ 240,612 for fiscal year ending March 1975, and totalling £ 755,422 for the entire period.

Gilbert Goodman, a resident of Canada, is the president of CWC, a New York corporation with offices in New York City. Since 1945, Mr. Goodman has been active in a family business, Crown Wall Paper Company, in Toronto, Canada. The exact relationship between the Canadian corporation and the New York corporation is not clear. Much of the advertising put in evidence by appellee carries the names of both companies and Mr. Goodman's testimony, as well as the testimony of other witnesses, does not, in many instances, distinguish between the two.[4]

CWC is not a manufacturer but converts its own line of goods [5] and is a distributor of imported goods of others. The record es-

tablishes that CWC has continuously, since 1964, used Crown in its company name. The company name is displayed on sample books and goods of others, which it handles as a distributor, i.e., in legends such as "Imported by Crown Wallcovering Corp." on the DECORENE and REGALIA lines of Storey Brothers & Company Limited. CROWN VINYL was used on labels for wallpaper and instruction leaflets beneath REGALIA in the early 1970's but was stopped in 1975 when WPML made an objection to use of this mark to Storey Brothers, the British manufacturer and supplier to both the U.S. and Canadian companies of Mr. Goodman. CWC has also identified its business by the trade names "Crown" and "Crown Wallcovering" in advertising. It has used CROWN FOILS as a trademark for wallcovering from time to time or possibly continuously since 1965–66. CROWN has been displayed on labels for wallcoverings called DECOR Photowalls since sometime after 1970. CWC's overall business has increased from $12,000 in 1964 to $1,250,000 in 1973 and to over $1,900,000 in 1975. No specific figures are given for CROWN FOIL or any CROWN brand products.

With respect to the allegations of abandonment based on WPML's non-use of the mark CROWN, the board said:

> Petitioner argued, with some vigor, that even conceding that there were some sales of wallcoverings under the trademark "CROWN" in the United States by respondent, they were insufficient to avoid abandonment as a result of nonuse coupled with an intention not to resume use, or nonuse for two consecutive years, because the quantum of use was very small both in absolute terms and in relation to respondent's worldwide sales.

> \*     \*     \*     \*     \*     \*

Our discussion of the evidence shows that, starting at least as early as 1948, respondent has made commercial sales of

---

**4.** We note in the board's opinion it corrected references it thought were incorrect.

**5.** "Converts" means a company has collections of wallcoverings designed and printed especially for itself, i.e., private label merchandise.

wallcoverings marked with the trademark "CROWN" to the United States. The sales were effected until the mid-1970's through independent distributors who, at least through the "LANCAST-RIA" collections, participated in the selection of the papers to be included in the various offerings. Since about the mid-1970's, sales have been made through companies under common corporate control with respondent.

It may be true that the "LANCAST-RIA" collections were promoted and sold under that name, but as discussed above, that does not denigrate the trademark significance of "CROWN", which was printed or stamped on the selvage or on the back or on the label of the wallcoverings. There is no rule of law that the owner of a trademark must reach a particular level of success, measured either by the size of the market or by its own total worldwide sales, to avoid abandoning a mark.

The law on what is needed to maintain the right to a mark against a charge of nonuse was explained in *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, [495 F.2d 1265] 181 USPQ 545 (2nd Cir., 1974). The important facts were that Patou, the American company, used its registration of "SNOB" for perfume to exclude from this country the "SNOB" perfume sold by le Galion in a number of countries while Patou itself used the mark only to the extent of selling 89 bottles of perfume in a period of twenty-one years without ever making a serious effort to merchandise its product. In view of this situation, the Court said, at 181 USPQ 548:

"Adoption and a single use of the mark may be sufficient to entitle the user to register the mark,... But more is required to sustain the mark against a charge of nonuse. To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory [citations omitted]."

Respondent's [WPML's] use was certainly deliberate; it was planned, purposeful, and ... profitable. The use was continuous; it could not remotely be described as sporadic, casual or transitory.

\* \* \* \* \* \*

Accordingly, we hold that respondent did not abandon its trademark "CROWN" because of nonuse for any period of time....

CWC's failure to prove the allegations of its petition, however, did not end the matter.

In its brief to the board, CWC advanced the position that WPML had abandoned its mark because its course of conduct had caused CROWN to lose its significance as an indication of origin in WPML, stating:

During the period 1964–1975, petitioner built up substantial rights and goodwill in CROWN as a trademark and trade name for its wallcoverings. *By 1975, CROWN had become associated in the United States with petitioner, not registrant.* During the same period registrant's use of "Crown" in the United States was at most "technical" use. Registrant should not be permitted to retain its "incontestible" registration of CROWN which would enable it to exploit petitioner's reputation under the CROWN mark and reap where it had not sown. The equities in this case strongly favor petitioner. For the foregoing reasons, it is respectfully requested that Registration No. 629,396 be cancelled. [Emphasis added.]

WPML responded with a motion to strike the argument from CWC's brief on the ground that this issue was never tried. The board refused, as a matter of policy, to strike a portion of a brief and reserved its ruling on WPML's objections until final decision. Except for stating that WPML could not have been "surprised" by certain testimony indicating that WPML had been aware of the use of CROWN by the U.S. company of Mr. Goodman since in or around 1973, the board did not discuss WPML's objection. In any event, the board did not decide the case on the ground asserted by CWC, that is, that CROWN identified only

petitioner, not respondent. The board framed the issue as follows:

> The critical question is whether respondent has permitted petitioner to use "CROWN" as a trademark or part of a trade name in the United States without objection and for such a period of time and under such circumstances that respondent's acts of omission (failure to take action effectively to stop petitioner's use) has caused the mark to lose its significance as an indication of origin.

The board then noted and discussed the following factors in the record:

> (1) WPML had been aware of CWC's use of "CROWN" as a symbol of trade identification since at least as early as 1973 and while objection was made to use of CROWN as a mark, it had taken no action against CWC's trade name usage;
> (2) the testimony of a witness, considered friendly to WPML, that the trade, being dealers, was likely to be more familiar with the Crown Wallcovering name since the company was a distributor they buy from than with the WPML's CROWN INDOOR RAINBOW book, one of hundreds of collection books; and
> (3) the testimony of a magazine publisher who refused to accept WPML's advertising for CROWN wallpaper because readers would assume the ad was by "the companies identified with Gilbert Goodman."

The board's rationale for cancellation then follows, which we quote in its entirety:

> The conclusion to which we are inevitably led is that, in the United States or at least a significant portion of the United States, the word "CROWN" no longer identifies either party's goods or distinguishes them from those manufactured or sold by the other. When a mark loses its capacity to point out uniquely the single source or origin of goods, it loses its status as a trademark. At that stage, the appropriate action is to cancel the registration because the registration is inconsistent with petitioner's equal right to use "CROWN", which right respondent apparently concedes. See: Bellanca Air-

craft Engineering, Inc., 190 USPQ 158 (TTAB, 1976); Electro-Coatings, Inc. v. Precision National Corporation, 204 USPQ 410 (TTAB, 1979). Respondent's apparent retention of a registration for a design of crown does not change the result because it is the word "CROWN" which dealers and purchasers would use to refer to the parties and their goods and it is the simultaneous use of the word "CROWN" which has caused confusion and may be expected to continue to cause confusion and mistake by the trade and the public.

> Decision: The petition is granted and Registration No. 620,396 will be cancelled in due course.

On appeal, WPML argues that abandonment was found on a basis not tried; that in any event failure to stop a single infringer is not an act of omission which will result in abandonment of a mark; that CWC failed to sustain the burden of proof that WPML's alleged acts of omission caused CROWN to lose its significance as an indication of origin in WPML; and that there is no evidence that WPML concedes CWC has an equal right to use CROWN. WPML also asserts that the board's view that a trademark becomes abandoned when it identifies two sources has no authoritative support in the law and should be rejected.

On appeal, CWC does not embrace, with any enthusiasm, the board's position which would result in neither party having trademark rights in CROWN. Rather, CWC urges affirmance on what it states are valid alternative grounds. In CWC's view, the board should have found WPML's use of CROWN to be so minimal as to be no use; that a trademark is abandoned when the owner fails to use the mark sufficiently to make some commercial impression in the marketplace; and that the board, thus, incorrectly rejected its allegations of abandonment for non-use as well as for fraud in WPML's filing of an affidavit under § 15.

CWC's principal argument, however, is that, regardless of WPML's continued use, the instant case presents one of those rare situations in which the mark in question has

ceased to serve as the prior user's trademark and has come to serve as the trademark of a junior user, asserting that the "meaning" of CROWN has been present in the case throughout the proceedings and that the extent of use and awareness of the trade are critical factors in determining "whether there has been a loss of distinctiveness and a *cessation of protectible rights*," (emphasis ours). In effect, CWC argues that WPML has forfeited all of its rights in CROWN to CWC by allowing CWC to become identified in the wallpaper trade by this name.

## OPINION

This appeal raises the question of the meaning of the term "abandonment" as used in § 14(c) (15 U.S.C. § 1064) and as defined in § 45 (15 U.S.C. § 1127). Under § 14, a person who believes he is or will be damaged by the registration of a mark on the Principal Register may petition for cancellation of the registration. With respect to a petition filed more than five years from the date of the registration, the grounds for cancellation are limited.[6] *Hy-Cross Hatchery, Inc. v. Osborne*, 49 CCPA 1163, 303 F.2d 947, 133 USPQ 687 (1962). The subject petition, brought more than 5 years after the issuance of the registration, is based on the following provision of section 14(c) which permits cancellation:

(c) at any time if the registered mark ... has been abandoned...

The following definition of "abandonment" is set forth in section 45:

*Abandonment of mark.* A mark shall be deemed to be "abandoned"—

(a) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) when any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to

lose its significance as an indication of origin.

Also pertinent to our decision here is the following definition also found in section 45:

*Trademark.* The term "trademark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

■ Abandonment, being in the nature of forfeiture, must be strictly proved. *P.A.B. Produits et Appareils de Beaute v. Satinine Societa*, 570 F.2d 328, 332–33, 196 USPQ 801, 804 (Cust. & Pat.App. 1978), 1 J. McCarthy, Trademarks and Unfair Competition § 17.3 at 592–93 (1973).

The board found the evidence insufficient to establish "abandonment" as defined in part (a) above. We agree. However, contrary to the board's decision, the finding of abandonment under part (b) was in error.

### Status as a Trademark

The foundation for the board's decision is its premise that when a mark functions as an identification of source for two companies, it ceases to function as a trademark for either. As stated by the board:

When a mark loses its capacity to point out uniquely the single source or origin of goods, it loses its status as a trademark.

At that stage, in the board's view, the appropriate action is to cancel any registration for the mark. Since there was testimony that CROWN identified WPML and other testimony that CROWN identified CWC, the board found that CROWN identified two sources. Therefore, in the board's view, it identified *neither* and WPML's registration of CROWN was inconsistent with CWC's "equal right" to its use. Moreover, "simultaneous use" of the word CROWN "caused confusion."

---

**6.** Section 14 is, in effect, a five year time limit barring certain attacks on a *registration.* It should be noted that this section is not depend-

ent on the filing of a declaration under § 15 which provides incontestable rights of *use* to a limited extent (15 U.S.C. § 1065).

However, we are left in the dark concerning the basis for the board's finding that CWC acquired any rights in CROWN as a subsequent user. The necessary elements of an estoppel by acquiescence, such as good faith adoption by CWC or reliance on acts of WPML, are not mentioned. The board simply concluded that CWC has an equal right. While the board added that WPML "apparently concedes" such equal right, there is no support in the record for that statement.

### De Facto Identification

In reaching its decision, it appears that the board was relying on *de facto* identification of source in two parties, that is, testimony as to *what source* the mark meant to purchasers. "Abandonment" would result in virtually every contest between claimants to a mark if significance were to be given to such testimony. Indeed, the question in most oppositions or cancellations is which of the *two* sources a mark identifies has better rights in the mark.

■ In this case, as in most others, some persons may attribute the goods to one source and others may know only the second. Others may, of course, not know who is the source. Still others, as in this case, may actually know both and distinguish between the two (regardless of the use of essentially the same trade identification) because of their intimate knowledge of the respective businesses. One witness in this case testified that CWC was better known because it advertised extensively and WPML had not. An employee of WPML's distributor testified she knew of WPML's use of CROWN only and did not know of CWC. Such testimony is irrelevant. Trademark rights are neither acquired nor lost on the basis of comparative popularity. *Sweet Sixteen Co. v. Sweet "16" Shop, Inc.*, 15 F.2d 920 (CA 8 1926); *See also Champion Spark Plug Co. v. Globe-Union Manufacturing Co.*, 24 Cust. & Pat. App. 1088, 88 F.2d 970, 33 USPQ 207 (1937).

The board's two-source abandonment theory would virtually assure cancellation whenever a trademark registrant's use of a mark is interrupted for an extended period, during which time another has developed an extensive market under the mark. Undoubtedly the junior user could find some purchasers who would testify that the mark identifies the junior user as a source. The registrant's claim to be a "source" which it must prove under part (a) would defeat its rights under part (b) as there are then two sources. The analysis of the necessary elements to establish abandonment in cases such as *Miller Brewing Co. v. Oland's Breweries*, 548 F.2d 349, 192 USPQ 266 (Cust. & Pat.App.1976) and *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 58 Cust. & Pat. App. 1172, 441 F.2d 675, 169 USPQ 590 (1971), would be rendered meaningless under the board's theory that rights are lost whenever the mark identifies two sources.

■ Moreover, even where there is reverse confusion of the public, that is, where the "infringer" is better known as a source at the time of suit, another source with superior *de jure* rights may prevail regardless of what source or sources the public identifies with the mark. Thus, CWC's argument that awareness of the trade determines "whether there has been a loss of distinctiveness" is unsupportable. *See* McCarthy, Important Trends in Trademark and Unfair Competition Law During the Decade of the 1970s (Part III), 71 Trademark Rep. 93, 107 (1981).

■ Clearly, *de facto* identification with a mark does not, in itself, establish any rights in a junior user.

### Concurrent Rights

■ If the board's premise is limited to circumstances where one party has allowed another to acquire an equitable right to use the mark in question, such circumstances do not create an abandonment of the mark or negate the first registrant's right to maintain its registration. Indeed, the *registration* of two marks which cause some confusion of the public has explicitly been recognized by this court. *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 189 USPQ 630

(Cust. & Pat.App.1976); *Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc.*, 49 Cust. & Pat.App. 730, 293 F.2d 685, 130 USPQ 412 (1961), *cert. denied*, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962).

The board's view that there is no trademark "when a mark loses its capacity to point out uniquely the single source or origin of goods," that is, unless one maintains *exclusivity* of rights, is, as argued by appellant, simply "bad law." Few longstanding trademarks could survive so rigid a standard.[7] The law cannot be and is not so divorced from commercial reality. Nor is the public interest served by declaring the mark *publici juris*, opening the way for greater confusion.

■ The most notable exception to a requirement of exclusive identification with a trademark is that provided in the statute itself. Under 15 U.S.C. § 1064, likelihood of confusion of source ceases to be a ground for cancellation once a mark has been registered for five years. Thus, even one with an "equal" right in a trademark based on priority may not attack the registration of another after five years on the grounds of likelihood of confusion of source. *See King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (Cust. & Pat. App.1974). The board's interpretation of abandonment, depending from its requirement that a trademark must not identify two sources, would negate the protection *intended* by the statute.[8] When a petitioner is precluded from an attack after five years on the ground that a registrant's use is likely to cause confusion with the petitioner's prior use, the attack need merely be rephrased in terms of abandonment, using the board's syllogism: (1) the mark identifies both the prior user and the registrant; (2) therefore it identifies neither; and, (3)

the mark has lost its status as a mark creating an abandonment. Thus, if the facts of use here were the same but CWC, the later user, owned a five-year old registration, under the board's view, WPML could effect cancellation based on its "equal" right to use. We disagree that any theory under the common law or the statutory definition of a trademark requires abandonment to be interpreted to encompass a concept that would nullify what was considered a major substantive advantage of registration.

### The Elements of Abandonment

The issues presented to the board here for resolution were not novel. The pertinent considerations with respect to finding abandonment under each of the above-quoted provisions of 15 U.S.C. § 1127 were addressed in *Guiding Eyes For the Blind, Inc. v. Guide Dog Foundation for the Blind, Inc.*, 55 Cust. & Pat.App. 701, 384 F.2d 1016, 155 USPQ 462 (1967), *aff'g* 146 USPQ 611 (TTAB 1965). The facts of the instant case and the prior case are strikingly parallel.[9] In the cited case both parties claimed rights in the mark GUIDING EYES in connection with providing guide dogs for the blind. Guide Dog Foundation (Guide Dog) began using the mark in 1949 and clearly was the first to use. Guiding Eyes for the Blind (Guiding Eyes) argued that Guide Dog abandoned its rights because of insufficient use, and by its acquiescence in Guiding Eyes' adoption and expanding use of GUIDING EYES, first in its trade name in 1954 and later as a mark. Moreover, Guide Dog had protested Guiding Eyes' use when the latter organization was in its infancy but never followed up on the matter. There was testimony by the public relations man

---

7.  *See American Security Bank v. American Security & Trust Co.*, 571 F.2d 564, 568, 197 USPQ 65, 67 (Cust. & Pat.App.1978); *Giant Food Inc. v. Malone & Hyde Inc.*, 522 F.2d 1386, 187 USPQ 374 (Cust. & Pat.App.1975); *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 133 USPQ 127 (CA 4), *cert. denied*, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

8.  *See* Hearings on H.R. 82 Before a Subcomm. of the Senate Comm. on Patents, 78th Cong., 2nd Sess., 23 (1944).

9.  While the Guiding Eyes conflict was in the context of an interference, the principles are the same, except that the party charged with abandonment here has the added benefits flowing from its registration (15 U.S.C. § 1057(b)).

for Guiding Eyes that he was familiar with the literature of Guide Dog and he had never seen and had no knowledge of its use of GUIDING EYES. A blind person, who had procured dogs from each of the parties, testified she did not know Guide Dog by the name GUIDING EYES. Thus, Guiding Eyes argued Guide Dog had abandoned the mark since Guiding Eyes had become identified with the mark. The board stated:

> Guiding Eyes urges that Guide Dogs minimal use of its mark amounted to non-use thereof. It then states that this factor when coupled with laches in that Guide Dog knew of Guiding Eye's expanding activities and use of its mark and trade name and took no action thereon subsequent to the telephone conversation in the middle 1950's, shows an intent to abandon or amounts to an abandonment by acquiescence. Guiding Eyes has cited several decisions which it states are in support of such a proposition.

While the record before us is inconclusive as to whether Guiding Eyes greatly expanded its activities over the years since 1954 on the strength of any inaction by Guide Dog, we are not convinced that there was any such acquiescence as to constitute an abandonment of "GUIDING EYES" by Guide Dog. In this regard, contrary to the findings in two of the cases cited by Guiding Eyes, there was no period of actual non-use by the original user, and it is clear from the record that [at] the time Guiding Eyes began its operations under the appellation Guiding Eyes for the Blind, Inc., it had knowledge of Guide Dog's earlier use of "GUIDING EYES" and that it was claiming rights therein. Its subsequent adoption of its corporate name and mark were therefore made in bad faith. Under such circumstances, when Guiding Eyes continued its use of its corporate name and began use of the mark in question it acted at its peril, and it cannot now prevail upon the theory that its continued

infringing use entitled it to the right of registration and defeats the prior user's right thereto. [Citations and footnote omitted.]

146 USPQ at 614.

In affirming the board's holding that the mark had not been abandoned by Guide Dog, this court stated:

> The record as a whole does not show that appellee's "course of conduct" had *caused* the mark "to lose its significance as an indication of origin." This defect in the record is not cured by appellant's reliance on the equitable principles of laches, estoppel and acquiescence under 15 U.S.C. § 1069. Under 15 U.S.C. § 1127 it is necessary to establish that the conduct of appellee was such as to cause a loss in significance of its mark as an indication of origin. The present record fails to do so.

55 Cust. & Pat.App. at 705, 384 F.2d at 1019, 155 USPQ at 464.

We do not perceive any error in this prior decision nor any factual distinction which would lead to a different conclusion here.[10]

The abandonment issues raised by CWC below were precisely those in *Guiding Eyes*: (1) Whether, under part (a), insufficient use caused abandonment; and (2) Whether, under part (b), the mark had lost its significance as an indication of origin as a result of the conduct of the prior user.

The evidence in *Guiding Eyes*, as here, failed to establish abandonment under part (a) by either actual non-use or insufficient use coupled with an intention to abandon. As indicated, we are not persuaded by CWC that the board's evaluation of the evidence here on this issue was in error.

With respect to part (b), in *Guiding Eyes* the prior user was found not to have abandoned its mark, despite a substantial degree of *de facto* identification in the second user. The evidence, as here, showed that some of the public continued to identify the prior

---

**10.** Appellee's case here suffers from even greater infirmities than that of the junior user of GUIDING EYES in view of WPML's registration which provides constructive knowledge of its rights (15 U.S.C. § 1072) and no proof of CWC's reliance on WPML's acquiescence in expanding its business.

user with the mark. Thus, the record did not establish that the *prior user's* "course of conduct" had *caused* the mark "to lose its significance as *an* indication of origin" (emphasis added).

Under no legal theory could this type of defect in the record be cured by laches, estoppel or acquiescence to an extent which merely created an equal right to use in the junior party. The board here has failed to perceive the distinction between conduct of a trademark owner which results in a loss of right to enjoin a particular use because of an affirmative *defense* available to that user and conduct which results in the loss of *all* rights of protection as a mark against use by anyone. Only when all rights of protection are extinguished is there abandonment. E. Vandenburgh, Trademark Law and Procedure 267–68 (2d Ed.1968). While this states only a conclusion without any guides as to when all rights are deemed to have been lost, it is helpful, nevertheless, to keep the distinction in mind. Acquiescence was, for example, effectively raised under part (a) to prove an *intention* to abandon where there was *no* use, in the authority cited by appellee.[11] The registrant there retained no rights. On the other hand, not every defense to a charge of infringement is also an affirmative ground for holding abandonment.

As stated in 3 R. Callman, The Law of Unfair Competition Trademarks and Monopolies § 79.1 at 514 (3d Ed.1969);

> Although some courts have indiscriminately used the terms "abandonment," "laches," and "acquiescence," as if they were mere synonyms, legally they are not the same. As better reasoned authorities put it, trademark rights may be adversely affected or completely forfeited by those concepts.

If the analysis in *Guiding Eyes* and the above authorities had been made here, the board could not have found CROWN abandoned or appellant to have lost its right of registration. However, the board, as well

as the dissent, recognizes no adverse legal effect of less severity than complete forfeiture of a trademark owner's rights if, in its view, he does not act soon enough against an infringer.

In *American Security Bank v. American Security & Trust Co.*, 571 F.2d 564, 568, 197 USPQ 65, 67 (Cust. & Pat.App.1978), this court, faced with conflicting claims to a mark, stated:

> Whatever appellant's right *to use* its name may be—and that is not a question which is before us—appellee's right is, in our judgment, superior to any right of appellant on the only issue we have to consider, namely, appellee's right to register.

Here, as well, whether appellee has a right to continue to use CROWN as a trade identification is not the issue. One must focus on what rights remain in WPML. The board's holding that WPML has not lost rights throughout the country means that it has sufficient rights to support its registration. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363, 121 USPQ 430, 433 (CA 2 1959). Indeed, its finding that CROWN identifies WPML as one of the two sources negates abandonment. Under part (b) a mark becomes abandoned only when the mark loses its significance as *an* indication of origin, not the *sole* indication of source.

Thus, even if it were correct that CWC has a *de jure* concurrent right to the use of CROWN for wallcovering, a holding of abandonment could not be sustained. See *Guiding Eyes for the Blind, Inc. v. Guide Dog Foundation for the Blind, Inc.*, supra. See also *Interstate Brands Corp. v. Way Baking Co.*, 403 Mich. 479, 270 N.W.2d 103, 202 USPQ 846 (1978), *cert. denied*, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 94 (1979). Nor, in any event, is a cancellation proceeding the proper vehicle for determination of *concurrent* rights. *Selfway, Inc. v. Travelers Petroleum, Inc.*,

---

11. *H.H. Scott, Inc. v. Annapolis Electroacoustic Corp.*, 195 F.Supp. 208, 130 USPQ 48 (D.Md. 1961).

579 F.2d 75, 198 USPQ 271 (Cust. & Pat. App.1978).[12]

### Policing One's Mark

■ Without question, distinctiveness can be lost by failing to take action against infringers. If there are numerous products in the marketplace bearing the alleged mark, purchasers may learn to ignore the "mark" as a source identification. When that occurs, the conduct of the former owner, by failing to police its mark, can be said to have caused the mark to lose its significance as a mark.[13] However, an owner is not required to act immediately against every possibly infringing use to avoid a holding of abandonment. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 209 USPQ 457 (CA 3 1981). Such a requirement would unnecessarily clutter the courts. Some infringements are short-lived and will disappear without action by the trademark owner. In the case of a mark temporarily not in use or only used to a limited extent, a company may be hard pressed to extend its financial resources to fight an infringer when it has little or no current market under its mark. Frequently one cannot determine with any certainty that one has priority over another's use. To charge another with infringement under such circumstances can be disastrous. Other infringements may be characterized as "creeping," starting as a business name,

and only become serious when later use is as a trademark. When that occurred here, WPML took effective action to stop the use of CROWN per se as a trademark. Assuming appellant accepted that CWC had some rights in CROWN as a trade name,[14] viewing CWC's use in the United States as an expansion of its longstanding Canadian operations, WPML may have considered that confusion could be avoided if both companies operated as they had and took reasonable precautions in their respective trademark vis-a-vis trade name usage.[15] The courts should not discourage such voluntary accommodations. *In re E.I. DuPont De-Nemours & Co.,* 476 F.2d 1357, 1362–63, 177 USPQ 563, 568–69 (Cust. & Pat.App.1973); *T & T Manufacturing Co. v. A.T. Cross Co.,* 587 F.2d 533, 201 USPQ 561 (CA 1 1978), cert. denied sub nom. *A.T. Cross Co. v. Quill Co.,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979). It is only the conduct of CWC that has brought the uses closer together.[16]

### Likelihood of Confusion

■ The board opinion indicates that cancellation is necessary to prevent likelihood of confusion. As this court has frequently said, a cancellation proceeding is not an unfair competition action. *American Lava Corp. v. Multronics, Inc.,* 59 Cust. & Pat.App. 1127, 1135, 461 F.2d 836, 842, 174 USPQ 107, 111 (1972). Nothing the

---

**12.** Where there is a likelihood of confusion, as the board found here, concurrent rights can only be recognized by a court of general jurisdiction which can decide whether a remedy can be fashioned to prevent or minimize confusion of the public. Our decision on appellant's registration does not preclude appellee from seeking a court's ruling. *See Holiday Inn v. Holiday Inns, Inc.,* 534 F.2d 312, 189 USPQ 630 (Cust. & Pat.App.1976).

**13.** From the legislative history it is evident that abandonment under part (b) was principally intended to encompass acts of omission or commission by the registrant which resulted in the mark becoming a generic term. *See e.g.,* Hearings on H.R. 102, H.R. 5461 and S. 895 before the Subcom. on Trademarks of the House Comm. on Patents, 77th Cong., 1st Sess. 104–115 (1941). A generic term refers to the genus of goods and a particular user's product is merely a species thereof. *Abercrombie &*

*Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9, 189 USPQ 759, 764 (CA 2 1976).

**14.** At oral argument, appellee's counsel acknowledged that the board relied principally on CWC's trade name usage, which is, in any event, evident from the opinion.

**15.** This is frequently the basis on which courts themselves resolve disputes. *See Holland Furnace Co. v. New Holland Machine Co.,* 24 F.2d 751 (E.D.Pa.1927); *Children's Television Workshop v. Sesame Nursery Centers, Inc.,* 171 USPQ 105 (N.Y.Sup.Ct.1970).

**16.** In *Clinton Detergent Co. v. Procter & Gamble Co.,* 49 Cust. & Pat.App. 1146, 1151, 302 F.2d 745, 749, 133 USPQ 520, 523 (1962), this court held that expansion of use by a junior user without regard to the conditional nature of the registrant's acquiescence defeated claims of acquiescence and laches.

board does can prevent parties from using a mark. The board's function is to determine whether there is a right to secure or to maintain a registration.

■ Likelihood of confusion does play a role in this proceeding. A reasonable belief by petitioner of a likelihood of confusion between the two uses provides standing to petitioner, but after·five years, likelihood of confusion cannot be brought into the case in the guise of abandonment. To equate likelihood of confusion of source with abandonment has no basis in logic or in law. The concepts are opposites. A particular term must indicate source for the concept of likelihood of confusion to be relevant.[17] If the term is in the public domain, which the board holds here, anyone is free to use it precisely because the public will not be confused. *See Loctite Corp. v. National Starch & Chemical Corp.*, 516 F.Supp. 190, 211 USPQ 237 (S.D.N.Y.1981).

### Conclusion

■ The only issue before us is abandonment—whether appellant has forfeited all rights because the mark CROWN no longer identifies appellant as a source for wallpaper. The board's finding that CROWN continues to function as a mark for appellant can only mean *appellant's acts* have not been of such character as to *cause* the mark to lose its significance as an indication of origin for appellant's goods. Ac-

cordingly, the decision of the board is *reversed.*

REVERSED.

MARKEY, Chief Judge, dissenting.

The issue of whether CROWN had lost trademark significance was, in my view, tried by the parties. If it weren't, this court has no business dealing with it.

The board neither mentioned nor applied an "exclusivity" standard. Erecting and destroying that strawman serves no useful purpose. The sole issue is whether WPML is entitled to retain its registration. The board noted the extent of CWC's use and held WPML's registration inconsistent therewith. In *this* case, one who orders CROWN wallpaper cannot possibly be assured of getting or avoiding wallpaper of one expected quality. Hence CROWN has lost all trademark significance. That circumstance is due to WPML's acts of omission. 15 U.S.C. § 1145(b). Its registration has in this case become an empty shell. Allowing registrants to retain registrations, while taking no action against years of adverse use of an identical mark on identical goods, demeans and degrades the register. I would affirm.

---

**17.** In *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40 (Cust. & Pat.App. 1981), the court dissected a similar hybrid rule into its constituent components where the

board incorrectly had held that likelihood of confusion of *source* could be found in an opposition based on an opposer's use of a descriptive term, without finding secondary meaning.