THIS DISPOSITION IS NOT
CITABLE AS PRECEDENT OF THE TTAB

Paper No.

SEPT 24, 98

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
————————

Trademark Trial and Appeal Board
————————

In re William F. Wielinski
————————

Serial Nos. 74/412,727 and 74/412,841
————————

Chad Klingbeil of Moore & Hansen for William F. Wielinski.

David Stine, Trademark Examining Attorney, Law Office 103
(Michael Szoke, Managing Attorney).
————————

Before Simms, Cissel and Hairston, Administrative Trademark
Judges.

Opinion by Cissel, Administrative Trademark Judge:

On July 15, 1993, applicant filed the above-referenced

applications to register on the Principal Register,

respectively, the mark shown below,



for "trucks, truck parts and accessories," in Class 12, and the mark "DIAMOND T" for goods which, as amended in that application, are specified as "structural parts for trucks," in Class 12; "printed periodical magazines," in Class 16; and "clothing, namely T-shirts," in Class 25. The basis for that application was applicant's claim of use of the mark in commerce since December 31, 1987 with respect to the goods in Class 12, since January 31, 1978 with respect to the goods in Class 16, and since January 31, 1978 with respect to the goods in Class 25. The basis for the application to register the mark combining "Diamond T" with the diamond design was applicant's assertion that he possessed a bona fide intention to use the mark in commerce in connection with the goods specified in that application.

Both applications are now before the Board because applicant filed timely notices of appeal from the final refusals to register the marks under several sections of the Lanham Act. Applicant and the Examining Attorney both filed briefs, but applicant did not request an oral hearing before the Board. Because both applications involve the same issues, we have resolved them together. This one



opinion explains our reasoning as to both appeals.

The Examining Attorney refused registration under Sections 1, 2, 2(a), 2(e)(1) and 45 of the Act on a number of grounds. His position is that registration is barred under Section 2(a) because applicant's marks falsely suggest a connection with the now-defunct former owner of the trademark, Diamond T Truck Company; that registration is barred under Section 2(e)(1) because the marks are merely descriptive of applicant's goods; that registration is barred under Section 2(e)(1) because the marks are deceptively misdescriptive of the goods in Class 12; that registration is barred under Sections 1, 2 and 45 because neither "DIAMOND T" nor Diamond T and the diamond design is a trademark, i.e., neither is recognized as an indication of a single source of origin of goods in view of their use, not just by applicant, but by a number of others as well; and that, as applied to the goods in Class 25, registration is barred by Sections 1, 2 and 45 of the Act because "DIAMOND T" is merely ornamental, and therefore does not function as a trademark for applicant's t-shirts.

After reviewing the record in these applications and considering the arguments of applicant and the Examining Attorney in view of the relevant legal principles, we find

that only the refusal based on Section 2(e)(1) with respect to the goods in Class 16 is appropriate.

Some factual background is necessary in order to understand the situation this case presents to us. The specimens of record for the goods in Class 16 in application S.N. 74/412,841, which are of record in both applications, are copies of a 1992 edition of applicant's newsletter, Salmagundi, "the periodical of the Diamond T Register." This publication prominently states that applicant compiles and edits it, and that "[n]either Salmagundi nor The Diamond T Register are (sic) affiliated with the Diamond T Motor Car Company, Diamond T Motor Truck Company, or the Diamond T Division, White Motor Company or their assigns."

According to the newsletter, the Diamond T Motor Car Company was started in Chicago, Illinois, in 1905 by C. A. Tilt. In the beginning, the company built only automobiles, but from 1911 on, it built only trucks. In the late 1950s, The Diamond T Truck Company and REO, apparently another manufacturer of trucks, were each sold to investors, who then sold both businesses to White Motor Company, which for a time operated them as separate divisions. In 1965, these two divisions were merged to form Diamond REO trucks.

The record indicates that the "DIAMOND T" trademark has not been used since the early sixties by Diamond REO or White, and that the registration once held by the now-defunct truck company expired in 1988, notwithstanding the abandonment of the mark well prior to then.

The Salmagundi newsletter on which applicant uses the marks sought to be registered is the house organ of The Diamond T Register, which is apparently an organization run by applicant. Members of the Diamond T Register are interested in Diamond T vehicles, all of which are antiques by now. The publication features news and information relating to activities of interest to these people, as well as historical information about particular Diamond T models, other old trucks and trucking history in general.

In his publication, applicant advertises "Diamond T" t-shirts, and other businesses advertise different products related to Diamond T trucks, such as reproduction parts for Diamond T trucks, copies of Diamond T manuals, Diamond T hatpins, Diamond T vinyl logos, and parts from Diamond T trucks. The newsletter also features advertisements wherein people list products and information they seek. Particular parts for specific models of Diamond T vehicles are listed there, as well as sales literature and manuals for Diamond T vehicles. In one instance, for example, an

advertiser is looking for a photograph showing the details of the hood on a 1917 Diamond T truck.

Section 2(a) of the Act requires that registration be refused if the mark sought to be registered "consists of or comprises matter which… may falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."

The Examining Attorney reasons that applicant's marks run afoul of this provision of the statute because

> the Diamond T brand is considered likely to have generated significant fame during its at least 54 years of use and its products remain the focus of significant historical and restoration trade interest. No mark is considered more likely to suggest a connection with Diamond T Motor Truck Company than the primary trademark applied to its product line. Furthermore, it is apparent that the applicant has absolutely no connection to the former Diamond T Motor Truck Company, other than the general interest shared by many others in the relevant trade. Since the goods identified in the application are directly related to the product line offered by the Diamond T Motor Truck Company, prospective purchasers are likely to assume some connection between applicant or applicant's goods and the former entity. (brief, p.2)

6

There are several problems with this theory.  To begin with, notwithstanding the Examining Attorney's conclusion that the "brand" used by the now-defunct Diamond T truck business is "considered likely" to have acquired "significant fame," there is no proof in this record that either the marks or the company are famous.  This record does not establish that a substantial number of people have knowledge or interest in either the former company or its abandoned trademarks.

Even if the fame of the prior trademarks were established beyond dispute, however, the fame of the abandoned trademarks is not the issue under Section 2(a) of the Lanham Act.  This section is not about likelihood of confusion with trademarks.  That problem is covered by Section 2(d) of the Act.  As noted by the Court in University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.2d 1373, 217 USPQ 505 (Fed. Cir. 1983),

> A reading of the legislative history with respect to what became Section 2(a) shows that the drafters were concerned with protecting the name of an individual or institution which was not a technical "trademark" or "trade name" upon which an objection could be made under Section 2(d)… Although not articulated as such, it appears that the drafters sought by Section 2(a) to embrace the concepts of the right to privacy, an area of the law then in an embryonic

state…

As the Board noted in Buffett v. Chi-Chi's, Inc., 226 USPQ 428, 429 (TTAB 1985), the portion of Section 2(a) which refers to the "false suggestion of a connection" evolved out of the rights of privacy and publicity. "Because these rights protect an individual's control over the use of his 'identity' or 'persona,' the elements of a claim of…'false suggestion' have emerged as distinctly different from the elements of a claim of trademark or trade name infringement." Further on in that opinion, the Board stated that "[a] party acquires a protectible interest in a name (or its equivalent) under Section 2(a) where the name claimed to be appropriated points uniquely and unmistakably to that party's personality or 'persona.' A party's interest in such a name or designation does not depend for its existence on the adoption and use of a technical trademark."

In the instant case, in order for the Board to affirm the refusals based on this part of Section 2(a) of the Act on the ground that applicant's marks falsely suggest a connection with another person (including a corporation or institution), it must be demonstrated: (1) that the marks are the same as, or a close approximation of, the name or identity previously used by the other person; (2) that the

marks would be recognized as such, in that they point uniquely and unmistakably to that person; (3) that the person named by the marks is not connected with the activities performed by applicant under the marks; and (4) that the prior user's name or identity is of sufficient fame or reputation that a connection with such person would be presumed when applicant's marks are used on applicant's goods. In re Kayser-Roth Corp., 29 USPQ2d 1379 (TTAB 1973), and Buffett v. Chi-Chi's Inc., supra.

This record does not establish that either "DIAMOND T" or the Diamond T and diamond design is of sufficient fame in the field of trucks, truck parts, magazines or t-shirts as a name or designation that it is unmistakably associated with, and points uniquely to, the persona of The Diamond T Motor Truck Company or its successors in interest. Moreover, even if "DIAMOND T" had been shown to be famous in these fields, such that an association with the truck company would likely be made, significant other problems, which we will discuss below, exist with respect to the refusal.

Applicant points out that the language used in Section 2(a) refers to "persons, living or dead," but does not mention corporate business entities that have ceased to exist.

Section 45 of the Act equates a natural person with a juristic person. At first blush, this would appear to favor the Examining Attorney's contention that the defunct truck manufacturer is entitled to protection under Section 2(a), but Section 45 goes on to define a "juristic person" as including "a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law." Prior decisions have supported the statute in requiring this capacity to participate in litigation. See: Morehouse Mfg. Corp. v. J. Strickland & Co., 407 F.2d 881, 160 USPQ 715 (CCPA 1969); Popular Merchandise Co. v. "21" Club, Inc., 343 F.2d 1011, 145 USPQ 203 (CCPA 1965); John Walker & Sons, Ltd. v. American Tobacco Co., 110 USPQ 249 (Comm'r Pats. 1956); and Copacabana, Inc. v. Breslauer, 101 USPQ 467 (Comm'r Pats. 1954).

The requirement that the juristic person possess the ability to sue and be sued is inconsistent with the contention of the Examining Attorney that Section 2(a)'s protection should be extended to encompass the identity or persona of a long-defunct business when there is no apparent person or business entity who or which could claim to be the successor in interest to the prior business.

The Examining Attorney dismisses as "coincidence" the fact that all the precedents he cited in support of his

10

refusal to register based on Section 2(a) involve living individuals or active business entities, but we cannot agree. A natural person's right to the use of a designation which points uniquely to his or her persona may not be protected under Section 2(a) after his or her death unless heirs or other successors are entitled to assert that right. Lucien Piccard Watch Corp. v. Since 1886 Crescent Corp., 314 F.Supp. 329, 165 USPQ 459 (S.D.N.Y. 1970). The person with whom the marks are said to falsely suggest a connection must have rights in its name or identity which are prior to those of the applicant. Kardex Systems, Inc. v. Sistemco N.V., 221 USPQ 149 (TTAB 1983); In re Kayser-Roth Corp., supra. In order to posses rights, such person, or someone to whom those rights have been transferred, must exist.

In the instant case, although the former business was a juristic person, it no longer exists, and we have no basis for concluding that anyone else is entitled to assert the right of that defunct business. In the absence of evidence that some person or ongoing business is the successor-in-interest to the Diamond T Motor Truck Company, whatever rights it had under Section 2(a) were extinguished when Diamond T Motor Truck Company ceased to exist.

There could be someone who stands in the shoes of the

11

former truck company, but this record does not establish who that might be. In any event, it is not up to the Examining Attorney to assert whatever rights such an unknown entity might possess. This is one of the purposes of the opposition procedure.

Rather than demonstrating that a basis exists for refusing registration to applicant under Section 2(a), what the Examining Attorney has essentially done is assert that applicant's trademarks are likely to cause confusion with the mark that was abandoned more than thirty years ago by the truck company that no longer exists. This is not a proper basis for refusing registration. Under the Examining Attorney's reasoning, a trademark that was once used and recognized as such, but has since been abandoned, could never be adopted, used and registered by another entity until all memory of the original owner had been lost by the relevant purchasing public. It is well settled, however, that after a mark has become abandoned, if it is then adopted and used by an entity unrelated to the original owner, the rights to the mark vest with the first to adopt and use it, providing that the new user takes reasonable precautions to prevent confusion. This is particularly important where the former owner of the abandoned mark continues to market the same product or

services under a similar name. Indianapolis Colts Inc. v. Metropolitan Baltimore Football Club Limited Partnership, 34 F.3d 410, 31 USPQ2d 1811 (7th Cir. 1994). As long as the new owner meets this requirement, (and the applicant in the instant case appears to have done so), subsequent users will have rights which are subordinate to the rights of the first entity to adopt it after the abandonment. Sutton Cosmetics (P.R.), Inc., v. Lander Co., 170 USPQ 461, (S.D.N.Y. 1971), aff'd. 455 F.2d 285, 172 USPQ 449 (2d Cir. 1972).

One of the expressed concerns of the Examining Attorney is that applicant will be able to use registrations resulting from the instant applications to stop others from marketing similar products under the "DIAMOND T" marks. In this regard, the Examining Attorney is correct. This is exactly what the registrations would facilitate. Our system is designed to allow anyone with rights superior to those of applicant eventually to prevail, whether as a successful opposer of the instant applications, or as the plaintiff in subsequent cancellation proceedings, but unless another entity can establish prior rights in connection with related goods, this applicant is entitled to the registrations and protection he seeks with these applications.

13

The second ground on which the Examining Attorney has refused registration is that the marks are merely descriptive of the goods specified in the applications under Section 2(e)(1) of the Act.

We note that this basis for refusing registration is not grounded on the contention that "DIAMOND T" is not used as a trademark for the magazines or the truck parts. The Examining Attorney accepted the specimens of record as demonstrating applicant's use of the marks as trademarks for these goods, and the acceptability of the specimens is not an issue before us on appeal.

The descriptiveness refusal to register is based on the contention that the marks only identify the fact that a characteristic or feature of the goods is that, in the case of the Class 12 goods, they fit, or may be used with, Diamond T trucks. For the goods in Class 16, the Examining Attorney contends that the mark identifies the subject matter of applicant's publication, and with respect to the t-shirts in Class 25, that the mark simply tells people that the wearer has an interest in Diamond T vehicles.

A mark is unregistrable under Section 2(e)(1) of the Act as merely descriptive of the goods with which it is used if it immediately and forthwith conveys information about the characteristics, features or functions of those

14

goods. In re Abcor Development Corp., 819 F.2d 1117, 2 USPQ2d 1859 (Fed. Cir. 1987). We will consider first the goods in Class 25, next the Class 12 goods, and then the goods in Class 16.

As is frequently the situation with trademarks displayed on the fronts of t-shirts, "DIAMOND T" on applicant's t-shirts functions as a trademark for the shirts, indicating secondary source or sponsorship in the applicant. See In re Olin Corp., 181 USPQ 182 (TTAB 1973). As in that case, the mark in the case before us may not tell the purchasing public the source of the shirt's manufacture, but rather that the owner of the "DIAMOND T" trademark sponsors or authorizes its use on the shirt. Identifying the secondary source of applicant's t-shirts does not constitute conveying information about their characteristics or features.

As applied to the trucks, truck parts and accessories applicant sells and intends to sell under the marks, the "DIAMOND T" mark identifies, and the Diamond T and design mark will identify, the source of the goods. The use of these marks on parts plainly does not describe the parts, any more than the mark "CHEVROLET" describes parts for use with Chevrolet® automobiles. The Examining Attorney has confused the function of describing characteristics of the

goods with identifying their source. A mark does not become merely descriptive of the goods on which it is used as a trademark just because the prior owner of the mark abandoned it. This is so irrespective of whether or not goods bearing the prior owner's mark still exist.

The same reasoning applies to the Examining Attorney's contention that the marks are also unregistrable under Section 2(e)(1) because they are or would be misdescriptive of any trucks, parts or accessories that did not emanate from the original owner of the mark. At the risk of being redundant, we reiterate that when applicant uses his trademarks, which he adopted after the prior owner had abandoned them, the use on applicant's products, whether the products are trucks, truck parts, newsletters or clothing items, serves, or will serve, to identify the source of those goods, and it is not or would not be a reference to the prior user, who abandoned the mark. The marks would not, and do not, describe applicant's trucks or truck parts, nor do they misdescribe them.

As noted above, however, the refusal based on Section 2(e)(1) of the Act must be affirmed as to the goods in Class 16. This case is analagous to the Board's decision in In re San Diego National League Baseball Club, Inc., 224 USPQ 1067 (TTAB 1983). In that case, the Board affirmed

16

the refusal to register "SAN DIEGO PADRES REPORT" and "SAN DIEGO PADRES" for newsletters which were concerned with the San Diego Padres baseball team because the marks immediately conveyed the fact that the periodicals dealt with the San Diego Padres. Similarly, in the instant application, "DIAMOND T" identifies the subject matter of the publication, and, because this information is a key characteristic or feature of the goods, the mark is merely descriptive of these goods within the meaning of the Act.

We thus turn to the remaining ground of refusal, that under Sections 1, 2 and 45 of the Act, neither "DIAMOND T" nor the Diamond T and diamond design functions as a trademark. The Examining Attorney's position is that in view of the fact that "Diamond T-related items are currently available from a number of sources," purchasers of trucks, truck parts and accessories marketed under the mark would "view product[s] bearing the instant mark merely as a correct or authentic restoration part for use on a Diamond T truck, rather than as goods emanating solely from the applicant herein." With regard to the mark as it is applied to applicant's newsletters, the Examining Attorney foresees that "prospective purchasers will regard the presence of the 'Diamond T' mark as merely an informational indication of the subject matter of the publication." In

17

connection with applicant's t-shirts, as discussed above, he contends that "DIAMOND T" "is likely to be perceived as a merely ornamental expression by the purchaser of an interest in vintage 'Diamond T' vehicles[,] and not as an indication of source." (All of the above quotes are from p. 6 of his brief in the application for the "DIAMOND T" mark.)

These arguments demonstrate further that the Examining Attorney has confused the concepts of descriptiveness and source identification. As with the previously discussed basis for refusal, this one boils down to a misunderstanding of the rights of one who adopts a trademark that has been used previously, but then abandoned. As applicant has repeatedly argued, under the doctrines of "first sale" and "fair use," the goods produced by the prior owner are identified by the marks used on them as emanating from that source, and it is and always will be permissible to use those marks in reference to such goods. In a similar sense, it will always be permissible for sellers of duplicate or replica replacement parts for Diamond T vehicles to state that their products are designed for and compatible with Diamond T vehicles.

With regard to the trucks, truck parts, accessories, magazines and t-shirts on which applicant has used, or

18

intends to use, these marks following their abandonment by the prior owner, applicant's use has been, and will be, as an indication of applicant as the source of the goods. As noted above, the opposition procedure will be available if anyone else thinks his rights are superior to those of applicant. At this juncture, however, we have no basis for concluding that applicant's trademarks should not be registered because use by others in reference to Diamond T vehicles or any other goods has resulted in the inability of the marks to indicate applicant as the source of the products on which they are and will be used. See Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 214 USPQ 327, 333 (CCPA 1982).

In summary, except for the refusal under Section 2(e)(1) to register the mark "DIAMOND T" for "printed periodical magazines," in Class 16, the Examining Attorney has not demonstrated a valid ground for refusing registration. Accordingly, the refusal to register as to the Class 16 goods in application S.N. 74/412,841 is affirmed, but each of the other refusals is reversed.

R. L. Simms

R. F. Cissel

P. T. Hairston
Administrative Trademark Judges
Trademark Trial & Appeal Board

**Ser No.** 74/412,841