THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: November 1, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE
____

Trademark Trial and Appeal Board
____

*Adamson Systems Engineering, Inc.*
*v.*
*Peavey Electronics Corporation*
____

Cancellation No. 92076586
____

Parna Mehrbani, Steven Wilker, and Stephanie J. Grant of Tonkon Torp LLP,
for Adamson Systems Engineering, Inc.

Ronald S. Bienstock of Scarinci & Hollenbeck, LLC,
for Peavey Electronics Corporation.

____

Before Heasley, Pologeorgis, and Dunn,
Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:

Respondent, Peavey Electronics Corporation, owns a Principal Register registration for the standard character mark **CS** for "amplifiers" in International Class 9.[1] Petitioner, Adamson Systems Engineering, Inc., seeks cancellation of Respondent's registration on the grounds of abandonment, genericness, and fraudulent maintenance of the registration.[2] Respondent's Answer denies the salient

---

[1] Registration No. 1486017 issued on April 26, 1988, and has been renewed.

[2] Petition for Cancellation, 1 TTABVUE.

allegations of the Petition for Cancellation.[3] Both parties have briefed the case.[4]

We grant the petition to cancel on the ground of abandonment. In view thereof, we need not reach the remaining grounds for cancellation. *See Fender Musical Instruments Corp. v. Win-D-Fender, LLC,* 2023 USPQ2d 61, *11 n. 21 (TTAB 2023).

## I.   Background

This case finds its origin in a cease and desist letter. On January 26, 2021, Respondent's counsel wrote to Petitioner, stating in pertinent part:

> As you know, [Respondent] Peavey is known throughout the world as an industry leader in the development, manufacturing and selling of speakers, amplifiers, guitars, bass guitars, audio and recording equipment, keyboards and other musical instrument related accessories.
>
> As such, Peavey owns an extensive portfolio of registered and common-law trademarks, including, but not limited to, the "CS" trademark (US Reg. No. 1,486,017) in connection with amplifiers (the "Peavey Mark"). …
>
> It has recently come to our Client's attention that Adamson Systems Engineering [Petitioner] has been advertising Your new "CS Series" of intelligent loudspeakers using the Peavey Mark. … Your products advertised using the Peavey Mark are sold in a similar market through similar channels of trade, our Client is concerned that Your continued use of the Peavey Mark may cause consumer confusion. While we trust that You did not intend to use the Peavey Mark to promote Your amplifiers, we

---

[3] 4 TTABVUE. Respondent also asserted the equitable affirmative defenses of acquiescence, laches, and unclean hands in its Answer, 4 TTABVUE 5-6, but did not pursue them in its final brief, so they are waived. *See Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1422 (TTAB 2014) ("As applicant did not pursue the affirmative defenses of failure to state a claim and unclean hands, either in its brief or by motion, those defenses are waived."). *See also TPI Holdings, Inc. v. TrailerTrader.com LLC,* 126 USPQ2d 1409, 1413 n.28 (TTAB 2018); ("Respondent also asserted 'estoppel, acquiescence and waiver,' but does not argue any of these in its brief. They are therefore waived."). Respondent also asserts that "The Peavey CS® mark has developed secondary meaning within the industry." 4 TTABVUE 5. This purported affirmative defense is unnecessary, as Respondent's subject registration for **CS** issued without a showing of acquired distinctiveness. Moreover, the defense is moot because we do not reach the claim of genericness.

[4] Both parties designated parts of their briefs confidential and submitted them under seal with redacted copies for the public record. When referring to a brief, the Board uses parallel citations referring to both versions.

appreciate Your understanding that such use constitutes infringement of our Client's registered intellectual property rights. See 15 U.S.C. §1114(1).

In light of the foregoing, we must demand that You cease and desist from any present and future distribution, marketing, promotion, offering for sale, and/or sale of any and all products discussed above that use the Peavey Mark. Moreover, we require that your client comply with the following demands immediately:

(1) Immediately cease and desist from the manufacture, having manufactured, use, distribution, promotion, importation, offering for sale and sale of goods using the Peavey Mark; and

(2) Remove all postings and offers for sale and promotion of, and references to, the Peavey Mark from all print or electronic media, including, but not limited to, your website and/or any all other websites, or print media, including, but not limited to, all social media, e-commerce websites, magazines, catalogues, brochures and the like.[5]

The cease and desist letter appended a copy of Petitioner's advertising:



---

[5] Respondent's January 26, 2021 cease and desist letter to Petitioner. Ex. 27, Respondent's Notice of Reliance (NOR) 47 TTABVUE 249, Courtland Gray deposition 62:17-20, 45 TTABVUE 168 (confidential). Testimony authenticating a non-confidential cease and desist letter cannot reasonably be considered confidential, and we exercise our discretion under the rule (set forth later in this opinion) to treat the testimony as not confidential.

> The CS-series of intelligent loudspeakers provides on-board amplification and DSP, plus Milan-ready AVB connectivity, with the same footprint as the acclaimed S-Series. CS-Series loudspeakers are available as standalone products or as an upgrade to existing S-Series products. CS Rack products include Gateway, Bridge, Network Distribution System, and Power Distribution System. And CS software upgrades your ability to design, deploy, control, and monitor in both mobile and installation environments. The new suite is designed with a professional audio workflow in mind: move from design & simulation, through patch, control, metering, optimization, and system diagnostics without ever leaving the system. This is Adamson's legendary sound, evolved for the networked future of professional audio. [6]

The next month, Petitioner instituted this cancellation proceeding.[7]

## II. The Record

The record includes the pleadings and the file of Respondent's subject registration. Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b). The parties also introduced the following evidence:

- Petitioner's Notice of Reliance, including the Notice of Rule 30(b)(6) deposition of Courtland Gray, Respondent's Chief Operating Officer and corporate designee; excerpts and exhibits from that deposition; excerpts from Respondent's amended answers to interrogatories; Respondent's amended responses to requests for production of documents; screenshots from Respondent's website; evidence of third-party use of CS (16 TTABVUE; 17 TTABVUE (confidential));

- Respondent's Notice of Reliance, including excerpts and exhibits from the Rule 30(b)(6) deposition of Respondent's corporate designee Courtland Gray; Petitioner's initial disclosures; Petitioner's responses to requests for

---

[6] 47 TTABVUE 249.

[7] 1 TTABVUE.

production and answers to interrogatories; Respondent's supplemental answers to interrogatories; publication on history of Respondent and CS amplifier; internet materials regarding Respondent's CS amplifiers (47-49 TTABVUE (corrected version), 43-46 TTABVUE (confidential corrected version));

- Petitioner's rebuttal Notice of Reliance, containing the entire Rule 30(b)(6) deposition transcript of Respondent's corporate designee Courtland Gray (23 TTABVUE; 24 TTABVUE (confidential)).

## III. Evidentiary Issues

Before proceeding to the merits, we address evidentiary issues arising from this proceeding.

### A. Motion to Strike and Objections to Evidence

During discovery, Petitioner took the Rule 30(b)(6) deposition of Courtland Gray, Respondent's Chief Operating Officer and corporate designee. Petitioner later submitted excerpts and exhibits from that discovery deposition in its notice of reliance.[8] Respondent then submitted in evidence its own excerpts from the Gray deposition.[9] Petitioner followed with its rebuttal notice of reliance, in which it made the entire Gray deposition transcript of record, although it designated only certain portions of the transcript as its rebuttal material.[10]

---

[8] 16 TTABVUE; 17 TTABVUE 25 et seq. (confidential).

[9] 43 TTABVUE 317 et seq. (confidential corrected version); 47 TTABVUE 316 et seq. (corrected version).

[10] 23, 24 TTABVUE (confidential).

On the same day Petitioner filed its rebuttal notice of reliance, Petitioner also moved to strike Respondent's reliance on:

> its own corporate deponent's discovery deposition as trial evidence through a notice of reliance. The rules could not be clearer that Registrant cannot rely on the discovery deposition of its witness—only the adverse party to the witness (Petitioner) can do so. Because Registrant is barred from relying on the discovery deposition of its own witness, the Board should strike those materials from Registrant's Notice of Reliance.[11]

Respondent opposed the motion to strike, and the matter is fully briefed.[12]

The Trademark Rules provide in pertinent part that "[t]he discovery deposition of … a person designated by a party pursuant to Rule 30(b)(6) … of the Federal Rules of Civil Procedure, may be offered in evidence **by an adverse party**." Trademark Rule 2.120(k)(1), 37 C.F.R. § 2.120(k)(1) (emphasis added). *See also* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 704.09 (2023).

There are, however, some exceptions to this rule. The Trademark Rules further provide that:

> If only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party. A notice of reliance filed by an adverse party must be supported by a written statement explaining why the adverse party needs to rely upon each additional part listed in the adverse party's notice, failing which the Board, in its discretion, may refuse to consider the additional parts.

Trademark Rule 2.120(k)(4). *See also* TBMP § 704.09.

---

[11] Motion to strike, 25 TTABVUE 2.

[12] Respondent's response to motion to strike, 26 TTABVUE; Petitioner's reply in support of motion to strike, 27 TTABVUE.

In this case, as Petitioner observes, the deposition of Respondent's Chief Operating Officer, Courtland Gray, "was the only deposition—discovery or trial testimony—taken in this case."[13] Both parties rely on his testimony, and neither party submitted another testimony deposition or declaration. "Abandonment is a question of fact." *On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000). And his testimony is a key means by which we determine the facts in this case.

When Petitioner offered excerpts from Gray's deposition, it was appropriate for Respondent to supplement the record with other portions of his deposition—the better to round out the record on the disputed factual issues. As the Board has found in similar cases, "the interests of fairness are served best by considering the additional excerpts of the … discovery deposition submitted … under notice of reliance." *Weider Pubs., LLC v. D & D Beauty Care Co., LLC*, 109 USPQ2d 1347, 1351 n.13 (TTAB 2014), *quoted in Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, *13 (TTAB 2022).

Petitioner critiques Respondent's notice of reliance, arguing that it fails to provide a written statement explaining why Respondent needs to rely upon each additional part of the deposition.[14] But Petitioner made the entire Gray deposition transcript of record,[15] which effectively moots the motion to strike because "evidence is either of record or it is not." *In re Brunetti*, 2022 USPQ2d 764, *5 (TTAB 2022), appeal

---

[13] Petitioner's main brief, 28 TTABVUE 9 (redacted), 29 TTABVUE 9 (confidential). Hereafter, Petitioner's main brief will be cited as 28, 29 TTABVUE.

[14] 25 TTABVUE 5; 27 TTABVUE 4.

[15] 23, 24 TTABVUE (confidential).

docketed, No. 23-1539 (Fed. Cir. Feb. 27, 2023). "A discovery deposition not properly offered in evidence under 37 C.F.R. § 2.120(k) may nevertheless be considered by the Board if the nonoffering party … treats the deposition as being of record, or improperly offers a discovery deposition in the same manner." TBMP § 704.09. Under the Trademark Rules, "When … a discovery deposition, … has been made of record by one party in accordance with the provisions of paragraph (k)(3) of this section, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence." Trademark Rule 2.120(k)(7), 37 C.F.R. § 2.120(k)(7).[16]

In view of these circumstances, especially Petitioner's introduction of the entire discovery deposition, and the important role played by the Gray deposition in this proceeding, we find that the interests of fairness are best served by considering his entire deposition transcript. *See Made in Nature v. Pharmavite*, 2022 USPQ2d 557, at *13; *Wear-Guard Corp. v. Van Dyne-Crotty Inc.*, 18 USPQ2d 1804, 1806 n.2 (TTAB 1990) ("Nevertheless, in reaching our decision, we have reviewed and taken into account the entire discovery deposition transcripts …."), *aff'd*, 17 USPQ2d 1866 (Fed. Cir. 1991). Petitioner's motion to strike Respondent's submission of excerpts from the Gray deposition transcript is denied.

Petitioner also moves to strike eleven documents Respondent submitted at trial on the ground that Respondent failed to produce the documents earlier in the course

---

[16] Respondent's notice of reliance on the Gray deposition furnishes a far more detailed explanation of the relevance of each excerpt than Petitioner's rebuttal notice of reliance, which merely states in pertinent part that Petitioner "reserves the right to rely on materials identified in Registrant's Notice of Reliance,…" and explains that Petitioner's additional excerpts of the deposition "[p]rovide[] context for deposition exhibits identified in Registrant's Notice of Reliance; abandonment and genericness".

of discovery.[17] As background: Early in the discovery phase of this proceeding, Petitioner moved to compel Respondent to respond fully to its document requests without objection.[18] Respondent did not respond, resulting in the Board's Order directing it to produce responsive documents "in full and without objection on the merits."[19]

Two of Petitioner's requests for production were as follows:

**Request #2:** All documents that you intend to introduce as exhibits during the testimony period in this matter.

**Request #14**: All documents related to the marketing, advertising, promotion, offering for sale, distribution, and/or sale of any goods bearing or using the CS Mark in the United States from 2012 to the present. This request includes, but is not limited to, documents indicating advertising expenditures as well as specimens of advertisements, brochures, promotional pieces, press releases, social media, websites, catalogues and materials used or to be used in connection with goods or services bearing or using the CS Mark in the United States.

Petitioner now moves to strike Respondent's trial exhibits 57 through 68 on the ground that Respondent failed to produce them during discovery.[20] The first exhibit, number 57, is vaguely described as "an undated excerpt from a book or magazine which summarizes activities during the 1970's, 1980's and 1990s."[21] The remaining ten exhibits are third-party online materials listing CS amplifiers for rent or sale, or reviewing or discussing them.[22] Petitioner asks that these exhibits be stricken, that

---

[17] Petitioner's motion to strike, 25 TTABVUE 3-5.

[18] Petitioner's motion to compel, 6 TTABVUE.

[19] Board Order, 9 TTABVUE 3.

[20] Petitioner's motion to strike, 25 TTABVUE 6-9, referring to Respondent's notice of reliance at 22 TTABVUE 510-627, 47 TTABVUE 516-633 (corrected copy).

[21] 25 TTABVUE 6.

[22] 25 TTABVUE 6-9.

Respondent not be permitted to rely on the exhibits in its trial brief, and that Petitioner be permitted to rely on the "improperly submitted materials."[23]

Respondent responds that the disputed exhibits consist of third-party materials that it had no prior obligation to produce and that may therefore be appropriately introduced to supplement the record.[24]

We find that Petitioner fails to establish that Respondent's conduct was so deficient as to warrant the sanction of striking the eleven exhibits, or allowing only one party to refer to them in trial briefs. Ordinarily, "[a] party is not required, in advance of trial, to disclose each document or other exhibit it plans to introduce." TBMP § 414(7); *see, e.g.*, *British Seagull Ltd. v. Brunswick Corp.,* 28 USPQ2d 1197, 1201 (TTAB 1993) ("A party is not required to disclose the entirety of its proposed evidence in support of its case during discovery."), *aff'd*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994). Moreover, "[g]enerally, a party does not have an obligation to locate documents that are not in its possession, custody, or control and produce them during discovery." TBMP § 406.02 (2023); *see Mystery Ranch, Ltd. v. Terminal Moraine Inc.*, 2022 USPQ2d 1151, *7 (TTAB 2022) ("a party need not investigate third-party use or registrations to respond to discovery requests") (citing *Rocket Trademarks Pty. Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1071-72 (TTAB 2011) (a party has no duty to conduct an investigation of third-party uses in response to discovery requests)).

---

[23] 25 TTABVUE 9-10.

[24] Respondent's response to motion to strike, 26 TTABVUE 4.

Respondent complied in good faith with the Board Order compelling discovery. As the Board observed in a later Order (denying Petitioner's other motion for sanctions) Respondent produced nearly 700 documents: "The Board finds that this number indicates that Respondent was genuine and concerted in meeting the deadline imposed by its prior order compelling such discovery."[25] Of the eleven subject exhibits, the first is of indeterminate provenance, and the rest reflect third-party online communications.[26] "Here, the record is inconclusive as to whether documentary evidence of the third-party [documents] was in [Respondent's] possession at the time of the relevant discovery requests. Thus, we cannot conclude that any such documents were improperly withheld." *Mystery Ranch v. Terminal Moraine*, 2022 USPQ2d 1151, at *7. The motion to strike is denied, and this evidence will be considered for whatever probative value it is worth.

In an Appendix to its main trial brief, Petitioner objects to the same third-party website printouts on the grounds that they are irrelevant and constitute hearsay to the extent they are offered for the truth of any matter asserted.[27] Petitioner further objects to Respondent's exhibits 3-4, and 56-57 on the ground that "Registrant sought to introduce the entirety of its initial and amended discovery responses. The Board, in its discretion, should decline to consider the entirety of these exhibits because

---

[25] Board Order, 15 TTABVUE 5.

[26] In its Appendix to its main trial brief, Petitioner characterizes Respondent's exhibits 65 and 66 as screenshots of "promotional youtube videos posted by Registrant in 2016 and 2018." 28, 29 TTABVUE 37. Respondent rejoins in its trial brief that "While Petitioner attempts to claim that these videos were posted by the Registrant, a cursory review shows that they were posted by third parties – not the Registrant." 30, 31 TTABVUE 39. In view of this disclaimer, we treat the exhibits as screenshots of third-party videos.

[27] 28, 29 TTABVUE 37.

Registrant failed to provide a written statement explaining why it needs to rely on the additional disclosures."[28] Respondent similarly objects to Petitioner's reliance on third-party websites (exhibits 3-31, 35-47), to the extent they are offered for the truth of any matter asserted, and to other exhibits (exhibits 33, 48-49, 69) on the ground that their probative value is outweighed by the danger of unfair prejudice.[29]

As the Board has made clear in prior rulings:

> Because a cancellation proceeding is akin to a bench trial, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such testimony and evidence. As necessary and appropriate, we will point out any limitations in the evidence or otherwise note that we cannot rely on the evidence in the manner sought. We have considered all of the testimony and evidence introduced into the record. In doing so, we have kept in mind the various objections the parties have raised and we have accorded whatever probative value the subject testimony and evidence merit.

*Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, *3-4 (TTAB 2020). We shall do the same here. *See also Grote Indus., Inc. v. Truck-Lite Co.*, 126 USPQ2d 1197, 1200 (TTAB 2018) ("We also remind the parties that our proceedings are tried before judges not likely to be easily confused or prejudiced. Objections to trial testimony on bases more relevant to jury trials are particularly unnecessary in this forum.").

### B. Over-designation of Materials as Confidential

The parties have over-designated as confidential or "attorneys' eyes only" large portions of the record, including the Gray deposition in its entirety and exhibits

---

[28] 28, 29 TTABVUE 38.

[29] 30, 31 TTABVUE 41.

pertaining to the central issues in this case—particularly, the extent of Respondent's use of the CS mark on amplifiers in commerce. We remind the parties:

> It is intended that the filings in Board proceedings be publicly available and the improper designation of materials as confidential thwarts that intention. It is more difficult to make findings of fact, apply the facts to the law, and write decisions that make sense when the facts shown by the evidence may not be discussed. The Board needs to be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decisions.

*Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1416 n.21 (TTAB 2016).

"The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party." Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g), *quoted in ARSA Dist., Inc. v. Salud Natural Mexicana S.A. de C.V.,* 2022 USPQ2d 887, *6 n.15 (TTAB 2022). *See also* TBMP § 412.01(c) ("The fact that the Board's standard protective order is automatically entered upon commencement in the proceeding does not give a party unbridled authority to designate its filed submissions to the Board as protected. … The Board may disregard the designation as 'confidential' for those matters which are improperly designated…."). Due to the improper designation of all record testimony as confidential, we resort to this rule and discuss evidence that cannot be reasonably termed confidential and is necessary to support our decision.

## IV.    Entitlement to a Statutory Cause of Action

Under Section 14 of the Trademark Act, "[a] petition to cancel a registration of a mark, stating the grounds relied upon, may … be filed as follows by any person who believes that he is or will be damaged… by the registration … (3) [a]t any time if the

registered mark becomes the generic name for the goods or services, … or has been abandoned, or its registration was obtained fraudulently….” 15 U.S.C. § 1064, *cited in Meenaxi Enter., Inc. v. Coca-Cola Co.,* 38 F.4th 1067, 2022 USPQ2d 602, * 3 (Fed. Cir. 2022).

Petitioner's Petition for Cancellation asserts all three of these grounds for cancellation.[30] Petitioner may not, however, rest on its allegations. Rather, it “must maintain its entitlement to the statutory cause of action throughout the proceeding and affirmatively prove its existence at the time of trial by introducing evidence to support the allegations in its pleading that relate to such entitlement as an element of its case-in-chief.” *Philanthropist.com, Inc. v. Gen. Conf. Corp. of Seventh-Day Adventists*, 2021 USPQ2d 643, *11 (TTAB 2021), *aff'd mem.*, 2022 WL 3147202 (Fed. Cir. Aug. 8, 2022). To establish entitlement, Petitioner must demonstrate (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration or continued registration of the mark. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, *4 (Fed. Cir. 2020); *Spanishtown Enters., Inc. v. Transcend Resources, Inc.*, 2020 USPQ2d 11388, *1 (TTAB 2020); *Kimberley Kampers IP Pty Ltd v. Safiery Pty Ltd*, 2022 USPQ2d 1036, *3-4 (TTAB 2022).

Respondent's cease and desist letter, introduced during the Rule 30(b)(6) deposition of its corporate designee,[31] serves to establish Petitioner's interest falling

---

[30] 1 TTABVUE 4-8.

[31] Gray depo. 62:17-20, 24 TTABVUE 22, 45 TTABVUE 168, cease and desist letter, 47 TTABVUE 246-49.

within the zone of interests protected by Section 14 of the Trademark Act, and its reasonable belief in damage proximately caused by the continued registration of Respondent's CS mark. *See Int'l Dairy Foods Ass'n v. Interprofession du Gruyère and Syndicat Interprofessionnel du Gruyère,* 2020 USPQ2d 10892, *11 (TTAB 2020) (standing found where applicant sent opposer cease and desist letters), *aff'd*, 575 F. Supp. 3d 627 (E.D. Va. 2021), *aff'd*, 61 F.4th 407, 2023 USPQ2d 266 (4th Cir. 2023); *Miller v. Miller,* 105 USPQ2d 1615, 1619 (TTAB 2013) ("These cease and desist letters [from applicant to opposer] provide additional evidence that opposer has business interests that have been affected, i.e., a real interest in the proceeding, and thus, has standing.") *cited in Apollo Medical Extrusion Technologies, Inc. v. Medical Extrusion Tech., Inc.*, 123 USPQ2d 1844, 1848 (TTAB 2017).

Petitioner's advertising, attached to the cease and desist letter, further establishes its status as a potential competitor to Respondent. *Peterson v. Awshucks*, 2020 USPQ2d 11526, at *6 (entitlement to a statutory cause of action found where petitioner and respondent are competitors), *cited in Mystery Ranch v. Terminal Moraine*, 2022 USPQ2d 1151, at *17. *See also Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002) ("[i]n most settings, a direct commercial interest satisfies the 'real interest' test"), *quoted in Monster Energy Co. v. Lo*, 2023 USPQ2d 87, *10 (TTAB 2023).

Accordingly, Petitioner has demonstrated its entitlement to institute and maintain this cancellation proceeding under Section 14 of the Trademark Act. 15 U.S.C. § 1064.

## V. Abandonment

### A. Applicable Law

"[T]he Lanham Act was not intended to provide a warehouse for unused marks." *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1394 (Fed. Cir. 1990). The Act accordingly provides for canceling a registration at any time if the registered mark has been abandoned. *Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374, 1376 (Fed. Cir. 1998) (citing 15 U.S.C. § 1064(3)). This provision permits the abandoned mark to return to the public domain, so it may be used by others in the marketplace. *Exec. Coach Builders, Inc. v. SPV Coach Co., Inc.,* 123 USPQ2d 1175, 1180 (TTAB 2017).

Under Section 45 of the Trademark Act, a mark shall be deemed to be abandoned:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.

Under the statute, there are two elements to a nonuse abandonment claim: (1) use of the mark has been discontinued, (2) with intent not to resume use. *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 2022 USPQ2d 513, *4 (Fed. Cir. 2022). Proof of these elements is a matter of fact, not speculation. *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1310 (Fed. Cir. 1989); *Yazhong Investing Ltd. v. Multi-Media Tech. Ventures, Ltd.*, 126 USPQ2d 1526, 1532-33 (TTAB 2018).

Since a mark registered on the Principal Register is presumed to be valid, 15 U.S.C. § 1057(b), "the burden of persuasion in a cancellation proceeding rests on the party seeking to cancel the registration. … A party seeking to cancel a registration must overcome the registration's presumption of validity by a preponderance of the evidence." *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1628 (Fed. Cir. 2009) (citing *Cerveceria Centroamericana,* 13 USPQ2d at 1309 and *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1665-66 (Fed. Cir. 1994)).

If a petitioner can show three consecutive years of nonuse, it establishes a prima facie showing of abandonment, creating a rebuttable presumption that use of the mark was discontinued with intent not to resume use. *On-line Careline v. Am. Online*, 56 USPQ2d at 1476; *ARSA v. Salud*, 2022 USPQ2d 887, at *24-25. The burden of production (i.e., going forward) then shifts to the respondent to produce evidence that it either used the mark or that it intended to resume use. The burden of persuasion remains with the petitioner, the party attempting to prove abandonment by a preponderance of the evidence. *Imperial Tobacco v. Philip Morris*, 14 USPQ2d at 1393; *Peterson v. Awshucks* 2020 USPQ2d 11526, at *9. If Petitioner does not prove three consecutive years of nonuse, it must prove both elements without the aid of a presumption—that is, that Respondent discontinued use of its mark with intent not to resume such use. *Double Coin Holdings Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, *15 (TTAB 2019).

## B. Summary of the Parties' Arguments

Respondent states it introduced the Peavey CS amplifiers to the market in the 1970's, regularly updating the series thereafter.[32]

Petitioner Adamson acknowledges that the amplifiers were popular in the 1980's, but contends as follows:

- In the early 2000s, Respondent Peavey stopped manufacturing the CS amplifiers in the United States and outsourced their manufacture to a firm in China.[33] Respondent also stored the CS amplifiers in a Chinese warehouse.

- In 2013, Respondent Peavey stopped promoting the CS amplifiers in the United States.[34] After 2013, CS amplifiers were entirely absent from its catalogs.[35] By 2015, consumers were posting on Respondent's message boards about CS amplifiers no longer being available. Respondent's responses on the message boards directed them to a different line of amplifiers.[36]

- Respondent's domestic U.S. sales of the CS amplifiers dwindled to a few in 2016-2017, then none from 2018 through 2020, then a single digit in 2021.[37]

---

[32] Respondent's brief, 30 TTABVUE (confidential), 31 TTABVUE 11 (redacted). Hereafter, Respondent's brief will be cited as 30, 31 TTABVUE.

[33] Petitioner's main brief, 28, 29 TTABVUE 13, 18.

[34] *Id*. at 13.

[35] *Id*. at 10, 23.

[36] *Id*. at 10, 24.

[37] *Id*. at 10, 18. We omit Petitioner's specification of the exact number of Respondent's annual sales, as Petitioner's cited source for that information was appropriately designated as confidential. We note that Respondent's brief does not object to improper use of confidential information by Petitioner. Where, in any publicly accessible filing, a party has cited, quoted from, or described, without redaction, testimony or documents that it has designated as confidential, or that its adversary has designated as confidential and the adversary has not subsequently objected, the Board may treat this as a waiver of the claim of confidentiality as

- In February 2021, Respondent's U.S. website stated that its CS amplifiers were no longer available. After Petitioner Adamson's counsel responded to Respondent's cease and desist letter, Respondent removed that page from its website and added information about its CS amplifiers.[38]

Petitioner concludes that "[t]hese facts are uncontroverted, and establish a period of nonuse in the United States of at least three years—if not since 2016, then at least throughout 2018 and 2020."[39]

Respondent rejoins as follows:

- Since 2012, Respondent has sold a significant amount of CS Series power amplifier units.[40]

- Between 2016 and 2021, there were, in addition to the sales identified above by Petitioner, single-digit sales of CS amplifiers to dealers in Puerto Rico in 2016 and 2020, and an auction sale of surplus items in 2019.[41]

- Respondent sells its amplifiers primarily through its network of independent dealers. And two of Respondent's dealers indicated in handwritten notes that each still has a CS Series amplifier in inventory.[42]

- There is an active warranty and repair business for CS amplifiers.[43]

---

to the content and subject matter of the pertinent materials. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1475 n.17 (TTAB 2017) and TBMP 703.02(a).

[38] *Id.* at 11, 24.

[39] *Id.* at 18.

[40] Respondent's brief, 30, 31 TTABVUE 15.

[41] *Id.* at 15, 26.

[42] *Id.* at 13-14, 16.

[43] *Id.* at 11, 16, 27.

- Respondent promoted CS Series products at the two National Association of Music Merchants trade shows it attended each year until the pandemic struck in 2020.[44]

- Respondent was planning to debut a new CS series amplifier at the June 2022 National Association of Music Merchants trade show, but was delayed by the pandemic, which disrupted global supply chains.[45]

Respondent concludes that "petitioner cannot establish a prima facie case. As a result, Registrant's intent to resume use never comes into play (as the use of the subject mark never ceased). Assuming arguendo that the intent to resume was at issue, Registrant has demonstrated a bona fide intent to resume the usage of the mark at issue."[46]

## C. Analysis

After reviewing all the evidence and arguments, we find that Petitioner Adamson has established a prima facie case of abandonment, and that Respondent Peavey has not overcome that presumption.

Trademark rights arise from the use of a mark in connection with particular goods or services. *Bertini v. Apple,* 63 F.4th 1373, 2023 USPQ2d 407, *5 (Fed. Cir. 2023) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 135 S. Ct. 1293, 113 USPQ2d 2045, 2048 (2015)). As the United States Supreme Court has declared, "There is no such thing as property in a trade-mark except as a right appurtenant to

---

[44] *Id.* at 13.

[45] *Id.* at 12, 27-28.

[46] *Id.* at 9.

an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S. Ct. 48 (1918), *quoted in Meenaxi v. Coca-Cola*, 2022 USPQ2d 602, at *5.

Respondent's CS mark registered on February 2, 1988, before passage of the Trademark Law Revision Act (TLRA). Even then, token sales and sporadic, casual, and nominal shipments of goods bearing a mark were insufficient to avoid a prima facie finding of abandonment. *Cont'l Grain Co. v. Strongheart Prods., Inc.,* 9 USPQ2d 1238, 1240 (TTAB 1988) (collecting cases); *see also Nabisco Inc. v. Wm. Wrigley Jr. Co.*, 40 USPQ2d 1251, 1257 (TTAB 1995) (citing TTAB decisions). "The pre-TLRA cases remain instructive because if a use does not meet the old pre-1989 'token use' standard, then it certainly will not rise to the higher level of 'use'" set forth in the TLRA. 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:111 (5th ed. Sept. 2023).

The statutory definition of "abandonment" reiterates the standard of "use in commerce," in effect since 1989 under the TLRA: "'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 USC § 1127, *quoted in Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S.__, 143 S.Ct. 2522, 2023 USPQ2d 760, *11 (2023). "The Board has reviewed the legislative history of the TLRA and found that the stricter standard for use in commerce contemplates 'commercial use of the type common to the particular industry in question.' *Paramount Pictures Corp. v. White*, 31 USPQ2d 1768, 1774 (TTAB 1994), *aff'd mem., White v. Paramount Pictures Corp.*, 108 F.3d 1392 (Fed. Cir. 1997)." *Lewis Silkin LLP v. Firebrand LLC*, 129 USPQ2d 1015, 1018

(TTAB 2018). "The word 'commerce' means all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127, *quoted in In re National Concessions Group, Inc.*, 2023 USPQ2d 527, *2 (TTAB 2023). "The types of commerce encompassed in this definition are interstate, territorial, and between the United States and a foreign country." TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 901.03 (July 2022).

The issue, then, is whether Respondent made bona fide use of its mark in commerce during the alleged period of nonuse: 2016 to 2021. As noted, Respondent, instead of submitting testimonial declarations or depositions of its own, chose to rely on the discovery deposition of its Chief Operating Officer, Courtland Gray, taken in late December 2021, at the end of the period of alleged nonuse. The notice of deposition topics included, inter alia:

> 1. [Respondent] Peavey's domestic (U.S.) sales of goods bearing the CS Mark, both directly and indirectly through distributors, retailers, or wholesalers, from 2012 to the present.

> 2. Peavey's future plans for the domestic (U.S.) manufacture, promotion, or sale of goods bearing the CS Mark.[47]

Mr. Gray pronounced himself capable of testifying as Respondent's corporate designee on all of the topics listed in Petitioner's notice of deposition.[48] In the course of his deposition, he testified as follows:[49]

---

[47] Gray deposition transcript and exhibits, 16, 17 TTABVUE 11.

[48] *Id.*, 10:6-8, 17 TTABVUE 32.

[49] With the exception of Respondent's annual sales of goods under the mark, which we describe generally in accord with the confidential designation, we do not find that Mr. Gray's testimony listed here could reasonably be described as confidential.

- Since the late 1990s or early 2000s, CS amplifiers have been manufactured in China.[50] They could be stored in a China bonded warehouse.[51]

- CS amplifiers did not appear in Respondent Peavey's product catalogs after 2013.[52] In 2015, one of Respondent's customer service representatives recommended Crest amplifiers instead of CS because, according to Mr. Gray, "we were possibly out of stock."[53]

- Respondent sold the CS amplifiers primarily through its dealer network.[54] It does not keep track of dealer sales to end consumers,[55] but it does keep track of its sales to its dealers on its SAP software system.[56] The underlying invoices are kept in its SAP software system.[57]

- Respondent did not produce the underlying invoices of its sales of CS amplifiers to dealers; instead, it produced two SAP spreadsheets summarizing its sales. The first (Gray dep. exhibit 5) shows annual unit sales from 2010 to 2021, and the second (Gray dep. exhibit 9) shows annual dollar amounts of sales from 2012 through 2021.[58]

- The spreadsheets corroborated Petitioner's position that Respondent had little or no domestic sales of CS amplifiers during the alleged period of nonuse. Exhibit 9 showed a total of three sales of CS amplifiers in the

---

[50] *Id.*, 19:7-15, 17 TTABVUE 39.

[51] *Id.*, 40:18-22, 17 TTABVUE 87.

[52] *Id.*, 22:10-11, 17 TTABVUE 41.

[53] *Id.*, 29:6-17, 17 TTABVUE 46.

[54] *Id.*, 24:19-21, 17 TTABVUE 42.

[55] *Id.*, 26:1-11, 17 TTABVUE 43.

[56] *Id.*, 26:12-14, 26:23-27:7, 17 TTABVUE 43-44.

[57] *Id.*, 36:11-13, 43:10-12, 17 TTABVUE 84, 89.

[58] *Id.*, Exhibit 5, 17 TTABVUE 3-5 (designated "Attorneys' Eyes Only"), Gray dep. 34:2-14, 17 TTABVUE 82. Exhibit 9, 16 TTABVUE 20; Gray dep. 58:22-59:7, 17 TTABVUE 49-50. Additional testimony concerning the various categories and entries in these exhibits may be found at Gray dep. 34:23-36:10, 37:20-38:5, 38:11-39:15, 40:18-41:24, 43:16-44:10, 58:22-59:22, 60:17-22, 106:19-107:4, 107:20-108:4; 24 TTABVUE 15-17, 21, 33.

United States in 2016 and 2017.[59] Referring to the Exhibit 9 spreadsheet, Petitioner's counsel asked Mr. Gray: "Q. Why is there no domestic column for 2018, '19 or '20?

    A. Probably didn't have inventory."[60]

- Deposition Exhibit 32 contained an online auction sales list, including one pallet, number 417, described as

```
417  3320  <p>                                                   1        950.00

          LOT ASST&#39;D PEAVEY AMPLIFIERS, CS4080HZ, PV3800, ETC.,
          (1 PALLET), (CUSTOMER RETURNS), (LOCATION SEC.1)</p>                    61
```

Pallet 417 purportedly had CS amplifier units.[62] Mr. Gray was asked:

Q. Were they things that have kind of been sitting around for a while?

A. Some of them were, yeah.[63]

    …

Q. And was everything from this auction sold?

A. I don't think everything was sold, no.[64]


Q. … And we can't tell from this how many of them were CS versus another type. Correct?

A. No.[65]

…

A. We would not have any way to know with SAP,

---

[59] Gray dep. 43:16-25, 44:3-10, 17 TTABVUE 89-90. Exhibit 9 confirmed that the two CS amplifiers were sold in 2017 for a total of $817. *Id.*, 59:10-14, 17 TTABVUE 50.

[60] *Id.*, 59:20-22, 17 TTABVUE 50.

[61] Exhibit 32, 45 TTABVUE 124. Gray dep., 108:5-18, 17 TTABVUE 72.

[62] *Id.*, 110:4-10, 45 TTABVUE 280.

[63] *Id.*, 109:18-25, 45 TTABVUE 279.

[64] *Id.*, 109:5-6, 45 TTABVUE 279.

[65] *Id.* 110:18-20, 45 TTABVUE 280.

you know, which -- how many or what was on that pallet.[66]

- Exhibit 32 to the Gray deposition also shows single-digit sales to two Puerto Rican dealers—one in 2016 and the other in 2020.[67] Mr. Gray opined that the sales to a U.S. protectorate would be considered domestic, but did not explain why the sales failed to appear on Exhibit 5, showing unit sales, or Exhibit 9, showing dollar amounts of sales.[68]

- There was one domestic sale of a CS amplifier in 2021, according to the Exhibit 9 spreadsheet.[69] As of February 2021, Respondent's U.S. website stated that its CS amplifiers were no longer available, and urged customers to "check out" other products. After Petitioner Adamson's counsel responded to Respondent's cease and desist letter, Respondent revised its website. Mr. Gray was asked:

    > "Q. Did Peavey make that change in response to the correspondence from Adamson?
    >
    > A. That may have had something to do with it."[70]

- As of December 2021, when the deposition was taken, Mr. Gray estimated that the current U.S. inventory for CS amplifiers was "a few," less than ten.[71] Respondent also submitted two handwritten notes it elicited from dealers in 2021, each attesting that it still had a single CS amplifier in stock.[72]

- Mr. Gray was asked, "Q. … [A]re you aware of any other dealers that are currently stocking CS amps?
    A. I don't know."[73]

---

[66] *Id.* 111:9-10, 45 TTABVUE 281.

[67] Ex. 32, 45 TTABVUE 128.

[68] Gray dep. 112:19-22, 45 TTABVUE 282.

[69] *Id.* 60:17-22, 106:2-107:25, 17 TTABVUE 51, 70-71.

[70] *Id.*, 63:21-65:2, 17 TTABVUE 53-55.

[71] *Id.*, 61:1-8, 17 TTABVUE 52.

[72] *Id.*, exhibits 20 and 21, 78:6-12, 80:9-12, 45 TTABVUE 190, 192. We note that the handwritten notes could have been submitted as testimonial declarations. *See generally* TBMP § 703.01(a). In their current form, they constitute nothing more than hearsay, and will be given no consideration.

[73] *Id.* 85:14-18, 17 TTABVUE 63.

Altogether, based on the evidence, we find that Respondent's sporadic, casual, and nominal use of the CS mark on amplifiers from 2016 through 2021 would not even meet the lower, pre-TLRA standard of use in commerce, much less the current higher standard of bona fide use made in the ordinary course of trade. 15 U.S.C. § 1127.

Respondent's assertion in its trial brief that "[s]ince 2012, [a significant number of] CS Series power amplifier units have been sold"[74] is based on its own interrogatory answer.[75] A party's submission of its own interrogatory answer is not an appropriate way to introduce evidence. Trademark Rule 2.120(k)(5) ("[A]n answer to an interrogatory … may be submitted and made part of the record only by the receiving or inquiring party….").

However, Respondent's Exhibit 5 spreadsheet, which is properly in evidence, albeit confidential, explains that Respondent's calculations are overly expansive **chronologically**, including sales from 2012-2015, before the relevant 2016-2021 time frame, and **geographically**, including international shipments of its Chinese-manufactured goods from its China warehouse to non-U.S. buyers.[76] If we restrict the parameters of our inquiry to domestic sales from 2016 through 2021, Exhibit 5, though confidential, tends to corroborate Petitioner's calculations. The Exhibit 9 spreadsheet, also properly in evidence, encompasses the same expansive time frame of 2012-2021, and international as well as domestic sales. It indicates a total of three domestic sales in 2016, 2017, and 2021—averaging one per year—and completely

---

[74] Respondent's brief, 30, 31 TTABVUE.

[75] Respondent's answer to interrogatory no. 4, 43 TTABVUE 125.

[76] Gray dep. Exhibit 5, 17 TTABVUE 3-5.

omits any mention of domestic sales in 2018-2020.[77]

This evidence indicates that there was bona fide domestic use of the CS mark on amplifiers in the ordinary course of trade from 2012 through 2015. In the 2012-2015 period, Respondent's domestic sales, measured in dollar amounts, were in the five-to-six figure range annually.[78] But after 2013, when Respondent last advertised the CS amps in its domestic catalogs, domestic sales plummeted, rapidly dwindling to single digits and then zero at some points in the critical 2016-2021 time frame.[79]

What constitutes "bona fide use of the mark in the ordinary course of trade" may vary over time as markets and businesses change. *Lewis Silkin v. Firebrand*, 129 USPQ2d at 1018; *see also M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 114 USPQ2d 1892, 1898 (Fed. Cir. 2015) ("Congress expressly rejected inclusion of a statutory definition for 'bona fide' in order to preserve 'the flexibility which is vital to the proper operation of the trademark registration system.'") (citation omitted). But Respondent's de minimis domestic use of the CS mark on amplifiers clearly fell below that standard.

Respondent tries to liken its de minimis domestic sales to *Person's Co. v. Christman*, 900 F.2d 1565, 14 USPQ2d 1477 (Fed. Cir. 1990), which noted that "[a]lthough [apparel] sales by Christman … were often intermittent and the inventory of the corporation remained small, such circumstances do not necessarily imply abandonment. There is also no rule of law that the owner of a trademark must

---

[77] *Id.,* Exhibit 9, 16 TTABVUE 20.

[78] *Id.*

[79] *Id.,* Exhibits 5 and 9, 17 TTABVUE 3-5, 16 TTABVUE 20.

reach a particular level of success, measured either by the size of the market or by its own level of sales, to avoid abandoning a mark." *Id.* at 1481 (citing *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 214 USPQ 327, 332 (CCPA 1982)) *cited in Tiger Lily v. Barclays*, 2022 USPQ2d 513, at *4-5.[80] But these cited opinions are distinguishable from the present case.

In *Person's,* the Board found that "[t]he evidence also clearly establishes that respondent has not abandoned use of the mark. Respondent has had intermittent sales of products bearing the mark, but periods between sales have never been long enough to create a presumption of abandonment, inventories of various items of stock bearing the mark have never been totally exhausted, and there is nothing which supports petitioner's argument that respondent had the intent to abandon use of the mark." *Person's v. Christman*, 9 USPQ2d 1477, 1480 (TTAB 1988).

The Federal Circuit opinion affirmed the Board's decision in *Person's,* and cited *Wallpaper Mfrs. v. Crown Wallcovering,* which stated, in turn, that:

> To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory ….
> Respondent's … use was certainly deliberate; it was planned, purposeful, and ... profitable. The use was continuous; it could not remotely be described as sporadic, casual or transitory.

*Wallpaper Mfrs. v. Crown Wallcovering*, 214 USPQ at 330-31 (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 181 USPQ 545, 548 (2d Cir. 1974)).

In *Tiger Lily v. Barclays* (the more recent Federal Circuit decision citing *Person's*

---

[80] Respondent's brief, 30, 31 TTABVUE 23-24.

and *Wallpaper Mfrs*.) the party asserting abandonment, Tiger Lily, essentially conceded that it could not prove nonuse of the subject LEHMAN BROTHERS mark, as the mark had been used continuously in connection with managing hundreds of billions of dollars' worth of assets—investing in, maintaining, and selling a vast portfolio of commercial real estate, securities, and derivative swaps. *Tiger Lily v. Barclays*, 2022 USPQ2d 513, at *5-6.

Here, in contrast, Respondent's actions evince a purposeful drawing-down of domestic CS amplifier sales. From 2012-2015, it supplied enough CS amplifier inventory to support robust domestic sales. It ceased listing CS amplifiers in its domestic catalog after 2013. By 2015, its customer service representative directed customers to another amplifier brand. As Mr. Gray testified, the precipitous decline in CS amplifier sales was due, not to a lack of demand, but a lack of "inventory."[81] Yet notably, international sales from Respondent's China warehouse remained in the five-to-six figure range annually from 2012 through 2021.[82] So Respondent could have furnished inventory to the domestic market, but evidently chose not to. By 2021, its U.S. website stated that the CS amplifier was no longer available.

Respondent tries to liken its de minimis domestic sales from 2016-2021 to *Christian Faith Fellowship Church v. Adidas*, where a church's pre-registration sale of two hats bearing its mark sufficed to support registration of the mark.[83] As Petitioner correctly observes, however, that case did not concern abandonment, but

---

[81] Gray dep. 59: 20-22, 17 TTABVUE 50.

[82] *Id.*, Exhibits 5 and 9, 17 TTABVUE 3-5, 16 TTABVUE 20.

[83] Respondent's brief, 30, 31 TTABVUE 24 & n. 6.

the scope of commerce that may be regulated by the U.S. Congress.[84] *Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 120 USPQ2d 1640 (Fed. Cir. 2016); *Ahal Al-Sara Group for Trading v. American Flash, Inc.*, 2023 USPQ2d 79, *7-8 (TTAB 2023). Respondent's sales to dealers in the United States and Puerto Rico fall within that scope, but from 2016-2021, fell to de minimis or zero, year to year.

Respondent's international shipments of its Chinese-manufactured goods from its China warehouse to non-U.S. buyers do not constitute use in commerce within the meaning of the Trademark Act. *See Fiat Group Autombiles S.p.A. v. ISM, Inc.*, 94 USPQ2d 1111, 1115 (TTAB 2010) ("activity solely outside the United States is ineffective to create or maintain rights in marks within the United States."); *Linville v. Rivard*, 41 USPQ2d 1731, 1736 (TTAB 1996) ("It is well settled that activity outside the United States does not create rights in marks within the United States."), *aff'd, Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998). *See generally* TMEP § 901.03; Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949, 954 (2010) ("Foreign commerce that is the subject of federal regulation therefore must be not only 'with' foreign nations, but also 'with' the United States. That is, there must be a U.S. nexus.").

Overall, looking at the evidence as a whole, as if each piece were part of a puzzle to be fitted together, *W. Fla. Seafood v. Jet Rests.,* 31 USPQ2d at 1663 (priority determination), we find that Respondent's de minimis domestic sales of the CS mark on amplifiers between 2016 and 2021 are insufficient to constitute bona fide use of

---

[84] Petitioner's reply brief, 39 TTABVUE 20 (confidential), 40 TTABVUE 20 (redacted). Hereafter, Petitioner's reply brief will be cited as 39, 40 TTABVUE.

that mark in the ordinary course of trade. *See Executive Coach Builders v. SPV Coach*, 123 USPQ2d at 1197 (isolated, de minimis uses insufficient to constitute use of mark in ordinary course of trade); *cf. Lens.com, Inc. v. 1-800 Contacts, Inc.*, 686 F.3d 1376, 103 USPQ2d 1672, 1677 (Fed. Cir. 2012) (sporadic, casual and nominal use did not amount to use in the ordinary course of trade).

We find accordingly that Petitioner has established a prima facie case of abandonment. "The prima facie case eliminates the challenger's burden to establish the intent element of abandonment as an initial part of [his] case, and creates a rebuttable presumption that the registrant abandoned the mark without intent to resume … use under the statute." *Rivard v. Linville*, 45 USPQ2d at 1376 (internal punctuation omitted). The burden of production (i.e., going forward) then shifts to Respondent to produce evidence that it has either used the mark or that it has intended to resume use. *Cerveceria Centroamericana v. Cerveceria India*, 13 USPQ2d at 1312 n.6.

Respondent Peavey's arguments and evidence do not overcome the presumption of abandonment. Respondent argues that it has "spent millions and millions of dollars on the advertising and marketing of its products throughout the years."[85] Even though it could not specify how much of these advertising dollars were attributable to the CS amplifiers, as opposed to other audio products,[86] Respondent asserts that it "continually advertised and marketed the CS Mark from its inception until today"

---

[85] Respondent's brief, 30, 31 TTABVUE 14 n. 3.

[86] *Id.*

including at the National Association of Music Merchants trade show.[87]

However, "[b]ecause 'use in commerce' means that the mark is placed on the goods and 'the goods are sold or transported in commerce,' *see* Section 45 of the Trademark Act, 15 US.C. § 1127, advertising and marketing without sales or transporting goods is not use of the mark." *Noble House v. Floorco*, 118 USPQ2d at 1418. *See also Clorox Co. v. Salazar,* 108 USPQ2d 1083, 1086 (TTAB 2013) ("The mere use of a trademark in the advertising or promotion of goods in the United States is insufficient to constitute use of the mark in commerce, within the meaning of the Trademark Act, where the advertising or promotion is unaccompanied by any actual sale or transport of the goods in commerce, as is the case here."). Moreover, Petitioner did not document its advertising or expenditures therefor during the period of nonuse, 2016-2021. Rather, as has been shown, it stopped advertising its CS amplifiers in its domestic catalogs after 2013. In fact, its deponent, Mr. Gray, testified:

> Q. … How does Peavey currently advertise its CS line of products?
> A. We aren't doing any current advertising for
> it.
> Q. Do you know when the last time was that Peavey
> actively advertised CS?
> A.  I don't.[88]

Respondent alludes to the "storied history" of the CS Series, and contends that "[a] mark is only abandoned when all trademark significance, including residual good will, is lost."[89] That contention, however, confuses the second part of the

---

[87] *Id.* at 13.

[88] Gray dep. 83:3-10, 17 TTABVUE 61.

[89] Respondent's brief, 30, 31 TTABVUE 12, 19.

abandonment statute with the first. The second part of the statute provides that a mark shall be deemed to be abandoned:

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

15 U.S.C. § 1127.

Evidence of residual goodwill can negate this second type of abandonment. Where "some of the public continued to identify the prior user with the mark, … the record did not establish that the prior user's course of conduct had caused the mark to lose its significance as an indication of origin…." *Wallpaper Mfrs. v. Crown Wallcovering*, 214 USPQ at 335 (internal punctuation omitted). "[S]o long as at least some purchasers identify respondent with the registered mark, it cannot be said that respondent's course of conduct has caused the registered mark to lose its significance as a mark." *Woodstock's Enters. Inc. (California) v. Woodstock's Enters. Inc. (Oregon)*, 43 USPQ2d 1440, 1446 (TTAB 1997) *cited in Ballet Tech Found., Inc. v. Joyce Theater Found., Inc.*, 89 USPQ2d 1262, 1273-74 (TTAB 2008).

However, residual goodwill does not negate a finding of abandonment based on nonuse. The first part of the statute speaks not to remembrance of things past, but to **use**. Under its terms, a mark may be deemed abandoned "(1) [w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. In *General Motors v. Aristide,* for example, General Motors tried to claim continued rights in the LASALLE mark for motor vehicles, pleading that:

> While no longer in production, Opposer's LASALLE vehicle has remained popular with enthusiast[s] and consumers throughout the world and, in particular, the United States, and continues to be associated in the minds

of such enthusiasts and consumers with Opposer and its Cadillac Motor Car Division.

*Motors Corp. v. Aristide & Co., Antiquaire de Marques*, 87 USPQ2d 1179, 1180 (TTAB 2008). The Board nonetheless focused on General Motors' nonuse of the mark:

> Opposer's nonuse on automobiles is in excess of sixty years. Indeed, opposer does not offer any evidence or explanation for its nonuse between 1940 and the early 1990's. It has not shown that it has used its LASALLE mark on any goods during this period nor has it provided any explanation for its plans to resume use of this particular mark on vehicles.

*Id*. at 1182.

Similarly, in *Azeka Building v. Azeka,* the opposer contended that "goodwill associated with the mark has not dissipated since the mark was last used in 2006." *Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1485 (TTAB 2017). Again the Board focused on nonuse, finding abandonment: "The testimony clearly shows that Opposer has not used the mark in the ordinary course of trade for over ten years. Accordingly, this nonuse for a period in excess of three consecutive years establishes prima facie abandonment of the mark AZEKA'S RIBS. Opposer does not deny its nonuse of the mark since 2006." *Id.* As some commentators have observed, "United States federal courts have struggled with the concept of residual goodwill. Some seem hostile to applying a principle that allows anyone to adopt an abandoned trademark and to begin using it, yet to date no court has protected a truly abandoned mark on the basis of residual goodwill, alone." J. Gilson and A. Gilson LaLonde, *The Zombie Trademark: A Windfall and a Pitfall*, 98 Trademark Reporter 1280, 1294 (2008).

Respondent, in its answer to Petitioner's interrogatory no. 1, states that "Despite not being actively sold by Peavey, there is an active resellers, repair and

refurbishment market for these legacy power amplifiers."[90] Respondent submits third-party online materials downloaded in February 2023 listing CS amplifiers for rent or sale, or reviewing or discussing them.[91] These materials were subject to Petitioner's motion to strike,[92] but we have considered them for whatever probative value they are worth.

In short, they are not worth much. First, resales by third parties do not inure to Respondent's benefit. A similar situation took place in *Gen. Motors v. Aristide,* where car enthusiasts would collect and resell LASALLE cars long after General Motors ceased producing them. The Board nonetheless stated:

> [W]e do not find that there is residual goodwill in the LASALLE trademark. Opposer's evidence that there are some car collector clubs that also collect LASALLE vehicles….
> Also, the simple fact that there are collectors of an item does not, by itself, defeat the statutory presumption of abandonment by the mark's owner after three years of nonuse in the ordinary course of trade.

*Gen. Motors v. Aristide*, 87 USPQ2d at 1183. *See also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION 19:139 (Sept. 2023) ("Products originally sold at retail and offered unused for resale to collectors in small quantities on Internet web sites (such as eBay) should, in the authors opinion, not qualify as being in "the ordinary course of trade."). Second, its third-party online evidence shows nothing more than third-party advertising and discussion, not sale, of CS amplifiers. *See Noble House v. Floorco,* 118 USPQ2d at 1418 ("advertising and marketing without sales or transporting goods is not use of the mark."). And third, Respondent downloaded these

---

[90] 16 TTABVUE 89.

[91] Respondent exhibits 58-68, 48 TTABVUE 92-143.

[92] 25 TTABVUE 6-9.

online materials in **2023**, long after the period of nonuse. *See General Motors v. Aristide*, 87 USPQ2d at 1183-84 (later efforts would represent a new and separate use, which would not serve to cure the abandonment).

Similarly, the repair and refurbishment of Respondent's CS amplifiers does not maintain its rights in the mark, as neither the repair shops nor the parts bear the brand. Mr. Gray testified:

> A. We have an external sales or service
> departments, you know, repair places throughout the
> country.
> Q. Are those Peavey-branded --
> A. No.
> Q. -- repair shops? I see.
> So it's just an independent repair shop that
> repairs Peavey products?
> A.  Correct. [93]
> …
> Q. Are any of the parts used for the CS amps also
> branded CS? And let me know if I need to clarify that.
> A. I don't think any parts are branded CS, no.[94]

The sale of unbranded replacement parts is insufficient to maintain rights in a mark. *Executive Coach Builders v. SPV Coach*, 123 USPQ2d at 1198 (citing *Gen. Motors v. Aristide*, 87 USPQ2d at 1186); *see also Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 56 USPQ2d 1343, 1347 (4th Cir. 2000). Moreover, as

---

[93] Gray dep. 36:20-37:3, 17 TTABVUE 84-85.

[94] *Id.* 19:19-21, 17 TTABVUE 39.

the U.S. Court of Appeals for the Federal Circuit stated in a fraud case, *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009):

> Mr. Sullivan [Bose's in-house counsel] explained that in his belief, Bose's repairing of the damaged, previously-sold WAVE audio tape recorders and players and returning the repaired goods to the customers met the "use in commerce" requirement for the renewal of the trademark. The Board decided that Bose's activities did not constitute sufficient use to maintain a trademark registration.
>
> ***
>
> We agree with the Board, however, that because the WAVE mark is no longer in use on audio tape recorders and players, the registration needs to be restricted to reflect commercial reality.

*In re Bose* Corp., 91 USPQ2d at 1942.

Respondent finally asserts that "the CS Series was scheduled for a planned update and the groundwork for which began in 2018 until it was hindered by the onset of the Covid-19 pandemic in 2020, which delayed the intended debut of the updated CS-series until the June 2022 NAMM show. … there can be no better contemporaneous example of excusable non-use, as the delay was the result of a killer virus, not the desire of Registrant."[95] These assertions, however, are unsupported by the evidence.

"A registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any, weight." *Rivard v. Linville*, 45 USPQ2d at 1376. "In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest." *Imperial Tobacco v. Philip Morris*, 14 USPQ2d at 1394. "Thus, to support a finding of intent to resume use of the mark, the owner must do more than simply

---

[95] Respondent's brief, 30, 31 TTABVUE 27-28.

assert a vague, unsubstantiated intent to make use of the mark at some unspecified time in the future. Rather, the owner must build a record 'with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.'" *Yazhong v. Multi-Media*, 126 USPQ2d at 1538 (quoting *Imperial Tobacco v. Philip Morris*, 14 USPQ2d at 1394-95). The Board may consider evidence regarding activities that occurred before or after the three-year period of nonuse to infer intent to resume use during the three-year period. *ARSA Dist., Inc. v. Salud,* 2022 USPQ2d 887, at *26-27. The presence of business records documenting these activities would strengthen the registrant's case, and the absence of such records does the opposite. *Tao Licensing, LLC v. Bender Consulting Ltd.,* 125 USPQ 2d 1043, 1053 (TTAB 2017), *cited in Vans, Inc. v. Branded, LLC*, 2022 USPQ2d 742, *14-15 (TTAB 2022).

In this case, Respondent's designee, Mr. Gray, testified that:

> [W]e fully intended and intend to come out with,
> you know, new technology using -- you know,
> for the CS product as well and evolve it.[96]

He was asked:

> Q…Whose decision was it to continue with the
> CS nomenclature for this new line of amps?
> A. Mine and Fred's. [Fred Poole, General Manager of Product Development for
> Respondent's North American Sales]
> Q. When did you all make that decision?
> A. Only about 2018.
> Q. So that's when -- in 2018 is when your plans
> started for this new line?

---

[96] Gray dep., 89:21-24, 17 TTABVUE 91.

A. That's when we started talking about what the

next evolution would be of it.[97]

He was unable, however, to adduce contemporaneous records documenting such plans or preparations:

Q. And are there any records of these

discussions?

A. Not that I'm aware of.[98]

…

Q. Between your initial discussions with Fred

starting in 2018 and this document [exhibit 23, an overview drafted in 2021 of

what the product would do] is there any other

documentation that we could look at that shows Peavey's

plans to launch a new CS line?

A. No.[99]

…

Q. Are you aware of other documents that were

provided to the vendor for purposes of developing the

new CS?

A. I'm not aware of any.[100]

And even though his deposition took place in December 2021, he admitted:

Q. Does Peavey have a prototype of the CS 8000?

A. Not yet.[101]

Respondent did not introduce testimony from Fred Poole, even though it identified

him in its answers to interrogatories as a person with knowledge of its current or

---

[97] *Id.*, 92:17-25, 17 TTABVUE 94.

[98] *Id.*, 93:6-8, 17 TTABVUE 95.

[99] *Id.*, 98:4-8, 17 TTABVUE 100.

[100] *Id.*, 102:1-4, 17 TTABVUE 104.

[101] *Id.*, 93:13-14, 17 TTABVUE 95.

intended use of the CS mark in the United States.[102] Respondent did not introduce testimony or documentation about how, if at all, the Covid-19 pandemic impeded its plans and preparations to resume use of the CS mark on amplifiers in the United States. As Petitioner notes, "Peavey produced not a single project schedule, internal or external email, memo, calendar appointment for a meeting—nothing indicating that it had a launch schedule that became derailed by the pandemic."[103] And Respondent did not explain how the pandemic supposedly impeded its shipments of CS amplifiers to the United States, but did not impede shipments from its China warehouse to international destinations.[104] As Petitioner notes, "it appears that while Peavey stopped promoting and selling CS amplifiers in the U.S., it continued to make and sell those same amplifiers abroad. Nothing in the record indicates any particular impediment to Peavey selling CS amplifiers in the U.S."[105]

We agree with Petitioner. As the Board has observed in prior abandonment cases, "[w]ithout credible documentation, Respondent has chosen to rely on … the testimony of a single witness, and this witness's testimony is both vague on critical points and riddled with inconsistencies." *Vans v. Branded,* 2022 USPQ2d 742, at *49. "Evidence of vague discussions concerning the potential use of the mark at some unknown point

---

[102] "2. Identify each person or entity with knowledge concerning (a) your current or intended use of the CS Mark in the United States; and (b) your manufacturing, sales and marketing plans for goods or services in the United States that bear or will bear the CS Mark.

Response: Courtland Gray, COO and Fred Poole, General Manager, Product Development, North American Sales. Peavey reserves the right to amend or supplement its answers and/or objections if Peavey determines that replacement or supplemental response or objection is necessary or required." Respondent's answers to interrogatory no. 2, 16 TTABVUE 89.

[103] Petitioner's reply brief, 39, 40 TTABVUE 20-21.

[104] Gray dep. Exhibits 5 and 9, 17 TTABVUE 3-5, 16 TTABVUE 133-36.

[105] Petitioner's main brief, 28, 29 TTABVUE 26.

in the future are insufficient to show an intent to resume use." *Azeka Bldg. v. Azeka*, 122 USPQ2d at 1488. The probative value of the witness's testimony is significantly undermined by his utter lack of detail. *Mars Generation, Inc. v. Carson*, 2021 USPQ2d 1057, *20 (TTAB 2021). The record is devoid of evidence showing any intention to resume use of the mark, much less evidence excusing Respondent's extended period of nonuse. *Rivard v. Linville*, 45 USPQ2d at 1377; *Auburn Farms, Inc. v. McKee Foods Corp.*, 51 USPQ2d 1439, 1445 (TTAB 1999).

In sum, Petitioner has established a prima facie case of abandonment, and Respondent's arguments and evidence fall far short of rebutting the presumption of abandonment. *Yazhong v. Multi-Media*, 126 USPQ2d at 1539.

### Decision

Petitioner has proven by a preponderance of the evidence that Respondent discontinued use of the registered CS mark on amplifiers with intent not to resume such use. 15 U.S.C. § 1127. The petition to cancel is granted on the ground of abandonment, and Registration No. 1486017 will be cancelled in due course.